GRIP-PAK, INC., Plaintiff-Appellant,

v.

ILLINOIS TOOL WORKS, INC., Defendant-Appellee.

No. 82-1119.

United States Court of Appeals, Seventh Circuit.

Argued Sept. 15, 1982.

Decided Nov. 24, 1982.

As Amended on Denial of Rehearing and Rehearing En Banc Jan. 12, 1983.

Joel R. Bennett, Kendrick, Netter & Bennett, Los Angeles, Cal., for plaintiff-appellant.

Earl E. Pollock, Sonnenschein, Carlin, Nath & Rosenthal, Chicago, Ill., for defendant-appellee.

Before CUDAHY, Circuit Judge, WEICK,* Senior Circuit Judge, and POSNER, Circuit Judge.

POSNER, Circuit Judge.

The plaintiff, Grip-Pak, Inc., is a company engaged in—or at least aspiring to engage in—the business of producing plastic holders for "six-packs" of beer and other beverages. The defendant, Illinois Tool Works, Inc., is alleged to be the dominant manufacturer of such holders, and in particular to manufacture 90 percent of all plastic holders for six-packs of canned beverages. The complaint, filed in 1977, charges Illinois Tool Works with a variety of practices allegedly forbidden by sections 1 and 2 of the Sherman Act and sections 3 and 7 of the Clayton Act, 15 U.S.C. §§ 1–2, 14, 18, including acquiring every patent there is on plastic beverage holders; threatening groundless patent-infringement suits to deter would-be competitors; prosecuting three "baseless and groundless lawsuits in bad faith, not for the legitimate purpose of adjudicating a legal controversy, but, rather, for an ulterior motive, i.e., to eliminate competition," one of these suits being against Grip-Pak and its principals (former employees of Illinois Tool Works) for theft of trade secrets; acquiring a competitor; dividing markets; and filing a fraudulent patent application. Treble damages and an injunction are sought.

The case comes up to us on Grip-Pak's appeal from summary judgment dismissing the complaint. The basis of dismissal was that Grip-Pak would not be able to prove at trial an essential element of its case, namely that it has been "injured in its business or property by reason of anything forbidden in the antitrust laws," as required by section 4 of the Clayton Act, 15 U.S.C. § 15. The complaint alleges injury of two sorts. The first consists of the expenses that Grip-Pak incurred in defending the suit brought by Illinois Tool Works against Grip-Pak and its principals; the other is a general loss of business profits from the totality of the alleged monopolistic scheme. The district court threw out the first element of injury on the following reasoning. Although the state court in which Illinois Tool Works had prosecuted its suit against Grip-Pak and Grip-Pak's principals had dismissed the suit on the merits, the court had entered a finding that the suit was "not malicious"; this finding is entitled to collateral estoppel effect in the present litigation; a nonmalicious lawsuit is not actionable under the antitrust laws; therefore the state court suit could not be a source of antitrust injury to Grip-Pak within the meaning of section 4 of the Clayton Act. With regard to the second and more general element of injury, the district court held that Grip-Pak was not in the business of manufacturing plastic holders for six-packs and did not have a sufficiently definite expectation of entering it to be injured in its business within the meaning of section 4. We have to decide whether these rulings are correct.

Late in the state court trial Grip-Pak's counsel tried to present evidence that Illinois Tool Works' case was malicious. The trial court was surprised. Illinois Tool Works' counsel protested vigorously his lack of opportunity to develop evidence on the issue of malice. Grip-Pak's counsel pointed to the prayer for relief in the counterclaim, where a finding of malice, and an award of attorney's fees based on that finding, had been requested; but the judge ruled that the issue of malice, to be preserved, should have been alleged in the part of the counterclaim that contained Grip-Pak's theory of liability. Grip-Pak's counsel then changed his tune slightly, saying: "We feel the proof is already in relative to the factu-

* Of the Sixth Circuit.

al evidence, the evidentiary evidence which will support our claim of malice." But the judge replied, "No, the court is not going to permit it." The antecedent of "it" is a bit vague, but the rest of the reply makes clear that the judge's intention was to forbid Grip-Pak "to assert a charge of this nature at this time." And the matter was dropped.

But when the judge came to prepare his findings of fact and conclusions of law he included a finding on malice. Despite the elimination of the issue from the trial both parties had submitted proposed findings on it, and the judge adopted the one submitted by Illinois Tool Works. But it seems that he did so in order to lay a foundation for declining to award attorney's fees as requested by Grip-Pak rather than to resolve a genuine factual issue at the trial, for he had not allowed the issue to be litigated. This interpretation is supported by an order the judge later issued denying a petition by Grip-Pak to vacate the finding on malice on the ground that he had lacked jurisdiction to make such a finding. The order states that at the trial the judge had "in substance held that under the pleadings a malice finding was not an issue," that he had "refused to permit evidence to be introduced on said issue," that "such a ruling may well make the later finding of the Court erroneous," and that he was not saying whether in these circumstances the finding would have collateral estoppel effect in any other proceeding, but was only holding that he had jurisdiction to make the finding, erroneous though it might be. The order has a tone of blaming the parties for having submitted proposed findings on malice when the judge had ruled the issue out of the trial; and the underlying fault is Grip-Pak's for having failed to raise the issue of malice in timely fashion and then having confused the judge by nevertheless submitting a proposed finding on malice at the close of the trial.

■ The doctrine of collateral estoppel prevents the relitigation of any legal or factual issue that has been "actually litigated and determined by a valid and final judgment." 1 Restatement of Judgments (Second) § 27 (1982). Usually an express finding in a valid final judgment is good enough, and we have that here. And it makes no difference whether such a finding was based on a complete failure of proof rather than on a weighing of competing proofs. See, e.g., *Continental Can Co., U.S.A. v. Marshall,* 603 F.2d 590, 595–96 (7th Cir.1979). On the other hand, a default judgment is not a proper basis for collateral estoppel. 1 Restatement, *supra,* § 27e at p. 257. And collateral estoppel is not properly invoked to punish a lawyer. *Id.,* § 27e at p. 256. We have to locate the present case in this web of principles.

■ It will help in doing so to note the difference between collateral estoppel and its sister doctrine, res judicata. Res judicata bars the relitigation of claims that could have been advanced in an earlier proceeding, whether they were or not, because they arise out of the same facts. The purpose is to reduce the costs of litigation, to the parties and to the courts, by forcing closely related claims to be combined in a single lawsuit. There is no suggestion that res judicata applies to this case—that Grip-Pak was required to bring its antitrust action as a counterclaim to Illinois Tool Works' state court suit. The doctrine of collateral estoppel is based on a different concept of economy of litigation: if an issue happens to have been litigated and determined in a previous suit between the parties, there is no reason to litigate it again. But the object is not to force the issue to be litigated in the earlier suit. The propriety of having two suits is accepted, presumably because they are not that closely related; and if the issue in question is first litigated in the second suit, that is fine; the only desideratum is that it not be litigated twice.

This distinction suggests that collateral estoppel should not be applied just because Grip-Pak's counsel in the state court action stumbled in trying to litigate the issue of malice. If the only consequence of his stumble was to postpone litigating that issue to this case, there was no waste of resources. It would be different if Grip-Pak had presented evidence so lacking in

probative force that the trial judge had concluded that there was an utter failure of proof on the issue of malice. Then resources would have been expended on the determination of the issue in the first case and relitigation would be barred. But that is not what happened. Grip-Pak's counsel contended in desperation that the requisite evidence had gotten into the trial somehow, but the trial judge disagreed. He thought he was preventing the issue from being litigated rather than resolving the issue on the basis of evidence already in the record.

■ All this assumes, though, that we are allowed to go behind the express finding in the state court's judgment and examine not only the pages of the transcript where the judge is seen blocking Grip-Pak's counsel from going forward with the issue but also the post-trial order in which the judge refused to vacate the finding but indicated that it was not intended to be an evidentiary finding. A court will not take evidence from the judge in an earlier suit to find out what his findings really meant. *Eaton v. Weaver Mfg. Co.*, 582 F.2d 1250 (10th Cir.1978); the parties ought to be able to rely on what the judgment says in guiding their behavior. But that is not a factor here. It is not that the judge had secret reservations about his judgment that did not emerge till long after it became final. Illinois Tool Works was privy to the circumstances that lay behind the finding, and the post-trial order was entered shortly after the judgment became final.

Although we believe that the issue of malice was never litigated and determined in the sense relevant to collateral estoppel, we are reluctant to stop there without considering whether, if collateral estoppel were applied, the finding that the Illinois suit was not malicious would bar Grip-Pak from seeking to recover in this antitrust suit the expenses it incurred in defending the Illinois suit. Grip-Pak points out that the finding, unelaborated as it is, implies only that the Illinois suit could not be the basis of an action for malicious prosecution under Illinois tort law; and it argues that a lawsuit does not have to violate some state's

law of malicious prosecution to be actionable under the Sherman Act. We think we should address this argument now for the guidance of the parties and the district court on remand. If the argument is correct there will be no need for the parties to introduce evidence on whether the state court action was malicious; if it is incorrect, that issue may be dispositive.

■ The tort of malicious prosecution in Illinois has two elements that might be relevant to this case: improper purpose, and lack of probable cause to believe that the lawsuit may have merit. *Holiday Magic, Inc. v. Scott*, 4 Ill.App.3d 962, 966, 282 N.E.2d 452, 455 (1972). One cannot tell from the state court's finding which element it thought was missing here—assuming, contrary to what we said earlier, that its finding was intended to determine an actually litigated issue. If the missing element was improper purpose, Grip-Pak's effort to characterize the state court action as anticompetitive would be devastated. A lawsuit could not be thought anticompetitive if it was no part of the plaintiff's purpose to suppress competition. But the judge may instead have thought that although the state court action was ultimately determined not to have merit, it had had enough apparent merit when brought to satisfy probable cause, which is just "a state of facts [that] would lead a man of ordinary caution and prudence to believe that he has a justiciable claim to prosecute against a defendant." *Hulcher v. Archer Daniels Midland Co.*, 88 Ill.App.3d 1, 4, 42 Ill.Dec. 797, 800, 409 N.E.2d 412, 415 (1980). We must consider therefore whether a lack of probable cause is essential to make a lawsuit actionable under the Sherman Act.

There are two grounds on which it might be thought essential. The first is that the First Amendment confers antitrust immunity on any lawsuit that is not so totally baseless as is implied by a finding that there was no probable cause to bring it. Some decisions state that the right to bring lawsuits, even of a purely commercial character, is protected by the First Amendment, as a form either of petition for re-

dress of grievances, *California Motor Transport Co. v. Trucking Unlimited,* 404 U.S. 508, 510, 92 S.Ct. 609, 611, 30 L.Ed.2d 642 (1972), or of speech, *id.* at 510–11, 92 S.Ct. at 611–12; *Hydro-Tech Corp. v. Sundstrand Corp.,* 673 F.2d 1171, 1177 n. 8 (10th Cir. 1982). But we do not believe that the extent of protection is invariant to the nature of the lawsuit—that the efforts of the National Association for the Advancement of Colored People to use constitutional litigation to break down official segregation, *NAACP v. Button,* 371 U.S. 415, 83 S.Ct. 328, 9 L.Ed.2d 405 (1963), are entitled to no more protection than the efforts of Illinois Tool Works to collect damages for an alleged theft of trade secrets—or, if Grip-Pak is right, to drive a competitor out of business.

■ If all nonmalicious litigation were immunized from government regulation by the First Amendment, the tort of abuse of process would be unconstitutional—something that, so far as we know, no one believes. The difference between abuse of process and malicious prosecution is that the former does not require proving that the lawsuit was brought without probable cause. *Holiday Magic, Inc. v. Scott, supra,* 4 Ill.App.3d at 966, 282 N.E.2d at 455; Prosser, Handbook of the Law of Torts 856 (4th ed. 1971). If abuse of process is not constitutionally protected, no more should litigation that has an improper anticompetitive purpose be protected, even though the plaintiff has a colorable claim.

■ The argument that such litigation is constitutionally immune is based on two Supreme Court decisions, *Eastern Railroad Presidents Conf. v. Noerr Motor Freight, Inc.,* 365 U.S. 127, 81 S.Ct. 523, 5 L.Ed.2d 464 (1961), and *California Motor Transport Co. v. Trucking Unlimited, supra. Noerr* held that conspiracies to influence a legislature to pass anticompetitive legislation are not actionable under the Sherman Act. The holding was presented as an interpretation of the Sherman Act rather than of the First Amendment, but one strongly influenced by the First Amendment. See 365 U.S. at 138, 81 S.Ct. at 530. The Court

viewed collective efforts to influence legislation, regardless of their purpose, as a form of petitioning for redress of grievances. *California Motor Transport* considered the application of *Noerr* to adjudication. The complaint alleged a conspiracy by a group of trucking companies "to institute state and federal proceedings to resist and defeat applications by respondents [competing trucking companies] to acquire operating rights or to transfer or register those rights." 404 U.S. at 509, 92 S.Ct. at 611. The Court held that the complaint stated a valid cause of action under the Sherman Act. Although it said that "the right of access to the courts is indeed but one aspect of the right of petition," *id.* at 510, 92 S.Ct. at 612, this statement was used as the fulcrum to lever the petitioners out of range of the First Amendment by characterizing the alleged conspiracy as one to prevent the respondents from exercising their legal rights to obtain and transfer operating rights. The Court quoted the allegation in the complaint that petitioners instituted proceedings " 'with or without probable cause,' " *id.* at 512, 92 S.Ct. at 612, and also stated that "a pattern of baseless, repetitive claims may emerge which leads the factfinder to conclude that the administrative and judicial processes have been abused," *id.* at 513, 92 S.Ct. at 612, but it did not say this was the only type of case in which litigation could be attacked under the antitrust laws.

It takes a rather free-wheeling imagination to extrapolate from the *California Motor Transport* opinion a principle that if applied across the board would, as we have suggested, make the tort of abuse of process invalid under the First Amendment; and we decline to do so—noting, also, that the Court used the language of abuse of process to describe the kind of litigation activity that the First Amendment does not protect, see *id.* at 513, 92 S.Ct. at 612. Cf. *Metro Cable Co. v. CATV of Rockford, Inc.,* 516 F.2d 220, 228 (7th Cir.1975). But it is a separate question whether, as a matter of antitrust principle, the Sherman Act should be interpreted to forbid using litigation to

suppress competition. The Act could not reasonably be interpreted to make companies, even ones with monopoly power, outlaws, forbidden to enforce their legal rights. And the line between effective and abusive resort to legal remedies is indistinct, especially since so many of the legal rights validly asserted in commercial settings are rights against what the law deems excessive or unfair competition. When Illinois Tool Works sued Grip-Pak and its principals for theft of trade secrets, it was asserting just such a right. Distinguishing a lawful from an unlawful anticompetitive purpose is harder than distinguishing lawful from unlawful purpose in abuse of process cases, though even there subtle distinctions abound—for example, the distinction between suing to get damages and suing to induce the defendant to discontinue the activity challenged in the suit by putting him to the expense of litigation. See *Alexander v. Unification Church of America,* 634 F.2d 673, 677–78 (2d Cir.1980).

But we are not prepared to rule that the difficulty of distinguishing lawful from unlawful purpose in litigation between competitors is so acute that such litigation can never be considered an actionable restraint of trade, provided it has some, though perhaps only threadbare, basis in law. Many claims not wholly groundless would never be sued on for their own sake; the stakes, discounted by the probability of winning, would be too low to repay the investment in litigation. Suppose a monopolist brought a tort action against its single, tiny competitor; the action had a colorable basis in law; but in fact the monopolist would never have brought the suit—its chances of winning, or the damages it could hope to get if it did win, were too small compared to what it would have to spend on the litigation—except that it wanted to use pretrial discovery to discover its competitor's trade secrets; or hoped that the competitor would be required to make public disclosure of its potential liability in the suit and that this disclosure would increase the interest rate that the competitor had to pay for bank financing; or just wanted to impose heavy legal costs on the competitor in the hope of deterring entry by other firms. In these examples the plaintiff wants to hurt a competitor not by getting a judgment against him, which would be a proper objective, but just by the maintenance of the suit, regardless of its outcome. See *City of Gainesville v. Florida Power & Light Co.,* 488 F.Supp. 1258, 1265–66 (S.D.Fla.1980).

Some students of antitrust law would regard all of our examples of anticompetitive litigation as fanciful, and in all the evidentiary problems of disentangling real from professed motives would be acute. Concern with the evidentiary problems may explain why some courts hold that a single lawsuit cannot provide a basis for an antitrust claim (see Fischel, *Antitrust Liability for Attempts to Influence Government Action: The Basis and Limits of the Noerr-Pennington Doctrine,* 45 U.Chi.L.Rev. 80, 109–10 (1977))—an issue we need not face here since three improper lawsuits are alleged, and it can make no difference that they were not all against Grip-Pak. Still, we think it is premature to hold that litigation, unless malicious in the tort sense, can never be actionable under the antitrust laws. The existence of a tort of abuse of process shows that it has long been thought that litigation could be used for improper purposes even when there is probable cause for the litigation; and if the improper purpose is to use litigation as a tool for suppressing competition in its antitrust sense, see, e.g., *Products Liability Ins. Agency, Inc. v. Crum & Forster Ins. Cos.,* 682 F.2d 660, 663–64 (7th Cir.1982), it becomes a matter of antitrust concern. This is not to say that litigation is actionable under the antitrust laws merely because the plaintiff is trying to get a monopoly. He is entitled to pursue such a goal through lawful means, including litigation against competitors. The line is crossed when his purpose is not to win a favorable judgment against a competitor but to harass him, and deter others, by the process itself—regardless of outcome—of litigating. The difficulty of determining the true purpose is great but no more so than in many other areas of antitrust law.

In rejecting the proposition that a non-malicious lawsuit can never violate antitrust law, we are supported by most of the cases, which are not numerous, on the question, see, e.g., *Kobe, Inc. v. Dempsey Pump Co.*, 198 F.2d 416, 424–25 (10th Cir.1952); *Rex Chainbelt, Inc. v. Harco Prods., Inc.*, 512 F.2d 993, 1004–07 (9th Cir.1975), though *Alexander v. National Farmers Organization*, 687 F.2d 1173, 1200 (8th Cir.1982), appears to be to the contrary. It is true that *Kobe,* which contains the clearest statement of the proposition that litigation having a colorable basis can still violate the antitrust laws, was decided before *Noerr* or *California Motor Transport;* but it continues to be cited with approval, see *Rex Chainbelt, supra,* 512 F.2d at 1004–05; *Handgards, Inc. v. Ethicon, Inc.*, 601 F.2d 986, 994 (9th Cir. 1979).

We conclude that the state court's enigmatic finding on malice, even if it were entitled to collateral estoppel effect in this litigation, would not be a bar to finding that Illinois Tool Works' lawsuit against Grip-Pak was an unlawful act under federal antitrust law. If Grip-Pak proves it was, it can recover damages measured by its expenses in defending that suit. See *Dairy Foods Inc. v. Dairy Maid Prods. Coop.*, 297 F.2d 805, 809 (7th Cir.1961).

The other damages sought by Grip-Pak are the profits that it says it would have made from developing and marketing a plastic holder that would compete with holders made by Illinois Tool Works. Grip-Pak has designed, and obtained patents on, several models of plastic six-pack holders; has entered into several joint ventures looking to eventual production of Grip-Pak holders; has promoted the sale of the holders (and some have in fact been sold); but, contrary to the allegations of its complaint, has never manufactured the holders itself. When Illinois Tool Works first moved for summary judgment the district judge denied the motion because he read an affidavit submitted by Grip-Pak to say that Grip-Pak had at last begun manufacturing holders through one of the joint ventures and had begun selling the holders in quantity; when he discovered this was not the case he granted the motion.

But it is not important whether Grip-Pak is or ever will be a manufacturer and seller of the products embodying its inventions. Manufacturers are not the only businessmen who can get damages under section 4 of the Clayton Act for competitive injury. A firm that develops and promotes new products does not forfeit the protection of section 4 by contracting out the manufacture and sale of the products to firms that specialize in manufacturing and selling rather than in development and promotion. And it is of no moment that the complaint mistakenly alleged that Grip-Pak is engaged in manufacturing its plastic holders; in modern procedure, the pleadings are required to conform to the proofs rather than the proofs to the pleadings.

Now it is true that if a manufacturer is the target of anticompetitive conduct, not every firm linked to him by the forces of demand and supply is entitled to sue for damages caused, indirectly, by that conduct. *In re Industrial Gas Litigation,* 681 F.2d 514, 519–20 (7th Cir.1982). For example, a patentee who licenses the manufacture of the patented product and whose royalties are keyed to his licensee's sales or profits cannot obtain damages caused by an anticompetitive scheme that is directed at the licensee, injures the licensee's business, and by so doing reduces the licensor's royalties. See *Productive Inventions, Inc. v. Trico Prods. Corp.*, 224 F.2d 678 (2d Cir.1955); *SCM Corp. v. Radio Corp. of America,* 407 F.2d 166 (2d Cir.1969); 2 Areeda & Turner, Antitrust Law § 341 (1978).

This is the application of the age-old tort principle of remoteness of damage to the novel statutory tort created by the federal antitrust laws. The tort principle serves practical goals of preventing duplicate recovery of damages and proliferation of lawsuits. Its operation is illustrated by *Rickards v. Sun Oil Co.*, 23 N.J.Misc. 89, 41 A.2d 267 (1945). Sun Oil Company negligently destroyed the only bridge linking an island to the mainland. Merchants located on the

island, including Rickards, lost business, and five of them sued Sun Oil. The court held that their loss was too remote. The owner of the bridge could of course sue for his loss. But if the island merchants had also been allowed to sue, Sun Oil might have ended up being liable for more than the total damages it had caused,. since those merchants' losses may well have been gains to mainland merchants to whom consumers switched when they no longer could reach the island. And even if the island merchants sustained losses not made up elsewhere in the economic system, those losses were no different from the losses suffered by many others who depended on the bridge. Therefore, if the five island merchants could sue, it would mean that the destruction of the bridge could give rise to an indefinite number of lawsuits, of marginal significance in terms of the deterrent and compensatory objectives of tort law compared to the suit by the bridge's owner, but potentially of great cumulative cost to Sun Oil and the judicial system.

The patent license case is an even stronger illustration of the reasons behind the doctrine of remoteness of damage. The patent licensor may have suffered no net diminution in his royalties at all. The contraction in the business of the licensee who was the target of an anticompetitive scheme may have led to an expansion in the business of other licensees and hence to an increase in the royalties paid by them to the licensor that offset the decrease in the royalties paid by the first licensee. And if the licensor were allowed to sue, why not everyone else whose fortunes are linked to the victimized licensee—or, if not everyone, at least the licensee's employees, his (other) suppliers, and the merchants who sell to his employees? None of these is more remote from the antitrust violation than the licensor.

But it does not follow from all this that a patent licensor may never get antitrust damages. It is not his status as a licensor but his relationship to the violation that determines his right to sue. If he is the defendant's target, he stands in the same relation to the defendant as the owner of the bridge did to the defendant in *Rickards,* and the tort principle of remoteness, absorbed by implication into section 4, would not prevent him from suing. Though we acknowledge the contrary intimations in *Shapiro v. General Motors Corp.,* 472 F.Supp. 636, 656 (D.Md.1979), and *Pastor v. American Tel. & Tel. Co.,* 76 F.Supp. 781, 784 (S.D.N.Y.1940), the facts of those cases are far different from those of this one.

If the allegations of the complaint are true, which for present purposes we must assume they are, Illinois Tool Works is determined to prevent anyone' else from competing with it in the plastic six-pack holder business and, having identified Grip-Pak and its principals as significant potential competitors, is trying to keep it and them out of business. On this theory it is a matter of indifference to Illinois Tool Works whether Grip-Pak manufactures holders or licenses others to do so. The important thing is Grip-Pak's invention. That is what Illinois Tool Works allegedly is trying to destroy. If the inventor, when he is the target of the anticompetitive scheme and not just an innocent bystander, may not sue for damages, anticompetitive behavior may go undeterred by threat of private damage actions. For unless the manufacturers of the product under license have resources specialized to the manufacture of that product, they may not suffer any damages at all from the withdrawal of the product from the market; they may be able to switch without cost to making something else.

All this is not to say that Grip-Pak has in fact sustained any damages as an inventor or developer or marketer from the alleged anticompetitive scheme. That depends among other things on the terms of the contracts between Grip-Pak and its licensees. We hold only that Grip-Pak is not barred from recovering damages merely because it is not a manufacturer. We go further: Grip-Pak may be able to recover lost profits as a manufacturer even though it has not yet started manufacturing, if it had reasonable prospects of doing so which

Illinois Tool Works snuffed out. Section 4 of the Clayton Act is not a bar. It does limit the damages recoverable in an antitrust case to those resulting from injury to the plaintiff's "business or property," which has been understood to limit damage liability to the plaintiff's direct pecuniary losses. If predatory pricing caused the president of the firm that was the predator's victim to commit suicide, his widow would not have a cause of action against the predator under section 4 for loss of consortium. This principle is again linked to traditional tort notions of remoteness of damage, as illustrated by such cases as *Kelley v. Kokua Sales & Supply, Ltd.,* 56 Haw. 204, 532 P.2d 673 (1975). A man died of a heart attack after being told in a long-distance telephone conversation that his daughter and one of his granddaughters had been killed in an accident, and the court held that his estate could not get damages against those tortiously responsible for the accident. Such cases do not bear on a case where an antitrust violation snuffs out a potential competitor before he gains a foothold, though he may have invested much money in preparing to enter the violator's market and may have given up lucrative opportunities in other fields. There would be a big gap in the damage remedies of the antitrust laws if the reference to "its business" in section 4 were read to prevent the recovery of damages by all would-be entrants.

But there is also a big problem of quantifying lost hopes. While damages for loss of future earnings and profits are familiar items in tort and contract cases, the problem of measurement is greater when the loss occurs in a market that the plaintiff is not yet in. Yet tort analogies are again helpful. We had occasion to observe recently that "if a man who had never worked in his life graduated from law school, began working at a law firm at an annual salary of $35,000, and was killed the second day on the job, his lack of a past wage history would be irrelevant to computing his lost future wages." *O'Shea v. Riverway Towing Co.,* 677 F.2d 1194, 1198 (7th Cir.1982).

In an attempt to balance the interest in deterrence against the concern with measurement, most courts (ours has not spoken to the issue before) have required a company that has not actually entered the market to show that it intended to enter and was prepared to do so within a reasonable time, if it wants to collect damages under section 4 for being excluded. See, e.g., *Martin v. Phillips Petroleum Co.,* 365 F.2d 629 (5th Cir.1966); *Huron Valley Hospital, Inc. v. City of Pontiac,* 666 F.2d 1029, 1033 (6th Cir.1981); *Fleer Corp. v. Topps Chewing Gum, Inc.,* 415 F.Supp. 176, 179–81 (E.D.Pa.1976); 2 Areeda & Turner, *supra,* § 335c at 174–75. This seems a sensible requirement which we adopt for this circuit without having to explore its precise dimensions in this case. In his first opinion the district judge found sufficient evidence of Grip-Pak's serious and imminent interest in manufacturing its plastic holders—a natural evolution from its joint ventures—to create a genuine issue of material fact, which barred summary judgment. On reconsideration he decided there was no such issue, because contrary to his original impression Grip-Pak had not yet begun to manufacture its plastic holders. But this in itself would not be determinative; the whole purpose of the "intention and preparedness" test is to allow recovery of damages in cases where the plaintiff has not entered the business in which he is seeking lost profits. Grip-Pak's evidence of intention and preparedness is quite thin; and the district judge may have been correct in concluding on reconsideration that it did not create a triable issue. But he did not apply the correct standard on reconsideration, and he must therefore reconsider once again in light of this opinion.

Illinois Tool Works argues that there is an alternative ground for the district judge's dismissal of the complaint: misrepresentations by Grip-Pak. We said earlier that Grip-Pak had presented in opposition to the initial motion for summary judgment an affidavit which the judge interpreted as stating that Grip-Pak had at last begun to manufacture plastic holders. When Illinois Tool Works moved for reconsideration of

the judge's denial of its motion for summary judgment, on the basis that the affidavit was misleading, it also asked for sanctions for the alleged misrepresentation, including dismissal of the complaint. The opinion granting summary judgment on reconsideration states: "Defendant's motion to reconsider [the denial of summary judgment] is granted and defendant's motion for contempt and sanctions for plaintiff's misrepresentation to the court is granted to the extent that the case will be dismissed." Illinois Tool Works asks us to punctuate this sentence by placing a comma after the first "granted." But a more plausible reading is that the judge granted just the motion for summary judgment, in light of his revised understanding of the affidavit; for he does not discuss the question whether an appropriate punishment for Grip-Pak's wrongdoing would be to dismiss the complaint, assuming summary judgment were improper. Moreover, while he describes the reference to manufacturing in the affidavit as an "affirmative misstatement," the judge also states that "it would be extremely reactive" to describe his misunderstanding as the result of "purposeful deception" and he therefore "decline[s] to assert the severe sanctions suggested by the defendant." To dismiss a possibly meritorious complaint with prejudice (the dismissal in the summary judgment is described as being "with prejudice") would be a severe sanction.

So we do not think we can uphold dismissal of the complaint as a sanction imposed by the district judge for the misleading affidavit. On remand Illinois Tool Works can if it wants renew its motion for sanctions. We express no view on the merits of the motion and of course none on the underlying merits of the lawsuit. We hold only that the complaint should not have been dismissed on the grounds advanced in the motion for summary judgment. We repeat that the district judge is free to reconsider the part of his order granting summary judgment that bars Grip-Pak from obtaining damages for lost manufacturing profits.

REVERSED AND REMANDED.