**PREMIER ELECTRICAL
CONSTRUCTION CO.,
Plaintiff,**

**v.**

**INTERNATIONAL BROTHERHOOD
OF ELECTRICAL WORKERS, et
al., Defendants.**

**No. 80C4976.**

United States District Court,
N.D. Illinois, E.D.

Nov. 1, 1985.

Jonathan G. Bunge, Steven H. Adelman, Michael R. Flaher, Carol L. McCully, Keck Mahin & Cate, Chicago, Ill., Peter H. Gunst, Frank, Bernstein, Conaway & Goldman, Baltimore, Md., for plaintiff.

J. Robert Murphy, Aurora, Ill., for defendants Local Union No. 461.

Theophil C. Kammhol, Vedder, Price, Kauf & Kammholz, Arthur B. Smith, Jr., Marian C. Haney, Chicago, Ill., for defendants.

Edwin H. Benn, Asher, Goodstein, Pavalon, Gittler, Greenfield & Segall, Chicago, Ill., for Local No. 176.

## MEMORANDUM OPINION AND ORDER

ANN C. WILLIAMS, District Judge.

This private antitrust action for damages and declaratory and injunctive relief is brought under Section 1 of the Sherman Antitrust Act, 15 U.S.C. Section 1. Presently before the court are various motions by plaintiff and defendants. An understanding of the contentions of the parties requires a review of the factual background of the case.

## FACTUAL BACKGROUND

Plaintiff, Premier Electrical Construction Co. ("Premier"), performs electrical construction work and otherwise transacts business in the electrical construction industry. Premier employs electrical construction workers who are members of, and represented by, defendant International Brotherhood of Electrical Workers ("IBEW") and its affiliated local unions.

Defendant IBEW is an unincorporated labor organization whose local unions represent electrical workers throughout the United States. Defendant Charles H. Dillard was International President of IBEW at all times relevant to Premier's complaint.

Defendant National Electrical Contractors Association, Incorporated ("NECA") is a national employers' trade association whose members perform electrical construction work. NECA has numerous affiliated local chapters that have been assigned specific territories throughout the United States. NECA and its local chapters provide various services to its member employers and represent them in collective bargaining with IBEW and its local unions. Premier is not a member of NECA. Defendant Robert L. Higgins was, at all relevant times, Executive Vice President of NECA.

Defendants Local Union #461 ("Local 461"), Local Union #176 ("Local 176"), and Local Union #701 ("Local 701") are all local unions, subordinate to IBEW, with their principal places of business in Illinois. The remaining defendants are the trustees of the National Electrical Industry Fund ("NEIF"), which is more fully described below.

Plaintiff's complaint is directed at Article Six of the 1976 National Agreement between NECA and IBEW. Article Six established the National Electrical Industry Fund, or NEIF, which is at the heart of Premier's antitrust allegations. The NEIF is an industry fund created primarily to cover NECA's cost of administering labor agreements with IBEW and its costs of rendering other services to the electrical contracting industry. Article Six requires that all construction agreements between IBEW unions and electrical contractors contain a clause by which the employer agrees to contribute 1% of the employer's gross payroll to the NEIF. This clause must be included in each agreement with an electrical contractor employer, even if the employer is not a member of NECA. Premier alleges that, in order to pay for NECA's services, prior to October 1976 NECA members paid dues to the association. Since these dues increased NECA members' cost of doing business, non-NECA members could offer lower bids on construction contracts. Premier claims that NECA sought to eliminate this competitive advantage, enjoyed by non-NECA employers, by creating the NEIF. Premier further contends that, by requiring a uniform 1% contribution to a fund to support NECA services, defendants entered into a combination and conspiracy in unreasonable restraint of trade in violation of Section 1 of the Sherman Act, 15 U.S.C. Section 1.

Plaintiff's present motion seeks to take advantage of the ruling of Judge Murray in *National Construction Association, et al.,*

*v. National Electrical Contractors Association, et al.,* 498 F.Supp. 510 (D.Md.1980) (the "Maryland litigation"). The pertinent details of that litigation are as follows. On August 8, 1977, IBEW, NECA, and various officials and members of NECA were sued in the United States District Court for the District of Maryland in a nationwide class-action antitrust suit. At issue was the legality of Article Six of the National Agreement. The named plaintiffs were various electrical contractors as well as the National Contractors Association, an association similar in function to NECA. By definition, Premier was a member of the class.

On September 8, 1980, Judge Murray awarded summary judgment to the plaintiffs in the Maryland litigation. In his ruling, Judge Murray declared that Article Six was a price-fixing agreement that constituted a *per se* violation of Section 1 of the Sherman Act. He also certified a plaintiff class and enjoined the defendants from enforcing the NEIF provision of Article Six. The Fourth Circuit Court of Appeals upheld the district court's ruling. *National Electrical Contractors Association v. National Contractors Association,* 678 F.2d 492 (4th Cir.1982). Petitions for certiorari were filed with the Supreme Court in early 1983, but were later withdrawn subsequent to a settlement agreement among the parties. The settlement agreement was approved by Judge Murray on July 25, 1983, after notice to class members and a hearing.

On September 16, 1980, eight days after the entry of summary judgment in the Maryland litigation, Premier filed the present action in this court. Its complaint is virtually identical to that in the Maryland litigation, with the only substantive difference being that the local union defendants are not the same as in the Maryland case.

On October 2, 1980, Premier appeared, through counsel, in the Maryland litigation to announce its intention to consolidate its action with the Maryland action. However, no further steps toward consolidation were taken by Premier until February 3, 1982, when Judge Getzendanner of this court ordered the parties to show cause why the case should not be transferred to Maryland pursuant to 28 U.S.C. § 1407. Premier then petitioned the Panel on Multidistrict Litigation for pretrial consolidation of its case with the Maryland litigation, but transfer was denied.

Premier did not further participate in the Maryland litigation until March 31, 1983. At that time, Premier asked Judge Murray to suspend notification of the settlement to class members. Premier wanted the suspension so that a subclass could be carved out. This subclass would consist of electrical contractors who had been sued, threatened with suit, or subject to any other collection efforts by the defendants, and who thereby had incurred costs and expenses in connection with those collection efforts. Judge Murray, however, denied Premier's motion. Sometime after this, Premier opted out of the Maryland class and continued its individual litigation in this court.

### PREMIER'S MOTION FOR PARTIAL SUMMARY JUDGMENT

Premier now seeks an order awarding it summary judgment on the issue of whether the Maryland defendants violated Section 1 of the Sherman Act.[1] Premier contends that the Maryland defendants should be collaterally estopped from relitigating the legal conclusions reached in the Maryland case.

 The propriety of applying collateral estoppel to preclude a defendant from relitigating issues determined against it in prior litigation was first examined by the Supreme Court in *Parkland Hosiery Co., Inc. v. Shore,* 439 U.S. 322, 99 S.Ct. 645, 58 L.Ed.2d 552 (1979). There the Court held that courts have discretion to apply collat-

---

1. The Maryland defendants are identical to the defendants here with the exception of Local Unions 461, 176 and 701.

eral estoppel offensively, so long as it would be fair to the defendant and promote judicial economy. *Id.* 439 U.S. at 331, 99 S.Ct. at 652. In determining the question of fairness, a court should consider: (1) whether the "plaintiff could easily have joined the earlier action"; (2) whether the defendant could have foreseen a later use of offensive collateral estoppel and therefore had "every incentive to litigate [the original action] fully and vigorously"; (3) whether "the judgment relied upon as a basis for estoppel is itself inconsistent with one or more previous judgments in favor of the defendant"; and (4) whether "the second action affords the defendant procedural opportunities unavailable in the first action that could readily cause a different result." *Parkland Hosiery*, 439 U.S. at 330–332, 99 S.Ct. at 651–652.

The parties here do not quarrel over the last three considerations, but vigorously debate the first. Since this is so, and the last three considerations do appear to weigh in favor of estoppel, the court will address only the question whether Premier "could have easily joined" the Maryland litigation.

Premier argues that it could not have easily joined the Maryland action because the Maryland plaintiffs were not adequately representing its interests in respect to damages. One element of the damages it seeks in the present action is the costs it incurred in defending lawsuits brought by defendants to enforce Article Six. Premier states that the Maryland plaintiffs made a tactical decision not to pursue this kind of damage claim. Premier further states that it moved to intervene to protect its interest, along with the interest of others, in pursuing the collection costs claims, but its motion to intervene was denied.

IBEW responds that, as evidenced by statements made in Premier's motion to intervene in the Maryland action, Premier discovered as early as the Spring of 1982 that its interests were not being adequately represented. Premier does not deny that it made this discovery in the Spring of 1982. Nonetheless, Premier waited until March of 1983 before requesting leave to intervene to represent its interests. According to IBEW, Judge Murray denied this request because he deemed it unfair to allow intervention on the eve of settlement. Thus, IBEW contends, Premier's intervention in the Maryland litigation was not precluded by a conflict between Premier's interest and that of the Maryland plaintiffs, but rather was precluded by the untimeliness of Premier's intervention attempts.

It appears that IBEW has the better of this argument. Premier gives no reasons why it waited until the eve of settlement, nearly a year after it allegedly learned that its interests were not being represented, before it moved to intervene. Moreover, Premier's contention that its individual action was brought because Premier was denied intervention is undercut by the fact that Premier filed its action in September, 1980, only eight days after Judge Murray's entry of summary judgment, rather than later, in the Spring of 1982, when it first learned that its interest was not being adequately represented. It seems to this court that Premier filed its suit prior to learning of the Maryland plaintiffs' inadequate representation of Premier's interest.

Premier further argues that it made two other attempts to participate in the Maryland action, but was unsuccessful because each time defendants resisted. Premier's first attempt was to transfer its action to Maryland pursuant to § 1404(a); the transfer was unsuccessful Premier says because of venue objections made by the IBEW local defendants. Next it made a request to the Multi-District Panel for transfer under § 1407; but again defendants objected, and so the Panel denied the request. IBEW does not dispute that Premier made these transfer efforts, which failed, but states only that failure to transfer resulted from certain statutory requirements.

Regardless of the reasons for the failure of Premier's transfer attempts, the fact remains that Premier was already a member of the Maryland class and could have sought to participate as a class member there before filing its duplicative lawsuit

here. Premier makes no argument that it was unaware of the Maryland litigation. Indeed, such an argument would be difficult to believe given the nearly word-for-word similarity between Premier's complaint and the Maryland complaint. The court is given no legitimate reason why Premier did not make timely attempts to participate in the Maryland action. Premier's recitation of its thwarted attempts to consolidate its action with the Maryland litigation is not persuasive.

■ Thus, Premier has not established that it could not have joined easily in the Maryland action. This, of course, is not surprising. As one commentator has observed, when an individual action is brought by a class member who has opted out of a prior class action, the last three prongs of the *Parkland* test will usually be satisfied; however, the requirement that the party asserting estoppel show that he could not have joined easily rarely will be met. Furman, *Offensive Assertion of Collateral Estoppel By Persons Opting Out of a Class Action*, 31 Hastings L.J. 1189, 1199 (1980).

■ This dilemma suggests that the *Parkland* test looses some of its usefulness when the previous judgment was rendered in a class action suit from which the party asserting estoppel has opted out. In such circumstances, the *Parkland* test might well result in a more difficult barrier to the use of issue preclusion by opt-out class action plaintiffs than is presented for plaintiffs who were never members of a class. Yet always to deny issue preclusion to the ex-class plaintiff may thwart judicial economy, a principle which underlies both collateral estoppel and, in part, Rule 23(b). Moreover, such denial may decrease the binding effect of the prior class judgment and frustrate the goal of uniformity of treatment among class members. On the other hand, IBEW argues that to accord preclusive effect to the Maryland decision would encourage the initiation of multiple lawsuits in other class action cases and would frustrate settlements in class ac-

tions, both results being contrary to the interest of judicial economy.

These conflicting considerations have been dealt with before. *In Re Transocean Tender Offer Securities Litigation*, 455 F.Supp. 999 (N.D.Ill.1978), involved multiple litigation arising out of a tender offer for the minority shares of Transocean Oil. Minority shareholders filed federal actions against the offeror in three federal district courts. Former minority shareholders then brought a class action, in Delaware state court, against the offeror. Judgment in the Delaware action was entered for the class before the conclusion of the federal actions. After consolidation of the federal actions, those federal plaintiffs who had opted out of the Delaware state action moved for summary judgment on grounds that collateral estoppel should be applied to preclude re-litigation of the defendants' liability. The court granted the plaintiffs' motion and, in doing so, addressed an argument similar to IBEW's:

> It could be argued that permitting opt out plaintiffs to assert collateral estoppel offensively might encourage plaintiffs in future class actions to exclude themselves from the class. Such an argument, however, has several short comings. As a practical matter, an extremely small percentage of persons seek exclusion from a class.... Moreover, few people can afford to bear the cost and burden of opting out and filing their own lawsuits....

*In Re Transocean Tender Offer Securities Litigation*, 455 F.Supp. at 1008.

■ In addition to the considerations pointed out in *In Re Transocean Tender Offer*, the court notes that the cost and expenses of litigation insure, to a degree, that those who do opt-out have a strong interest in pursuing their own individual action. Moreover, it appears that the policies underlying the modern doctrine of collateral estoppel, as developed by the Supreme Court in *Blonder-Tongue Laboratories, Inc. v. University of Indiana Foundation*, 402 U.S. 313, 329, 91 S.Ct. 1434, 1443, 28 L.Ed.2d 788 (1971) and *Parkland*

*Hosiery*, counsel in favor of applying collateral estoppel in the context of the opt-out class action plaintiff. The overriding considerations should be whether the defendants in the class action had a full and fair opportunity to litigate the issues in the prior action and "whether judicial economy will be served by an application of collateral estoppel." *In Re Transocean*, 455 F.Supp. at 1008. These considerations outweigh the concern that failure to closely examine a plaintiff's motives for opting out of a class may result in a "free ride" for one who has merely "sat on the sidelines" awaiting the judgment in the first suit.[2] In summary, the court finds that the defendants here are precluded from relitigating the issue of whether Article Six is a *per se* violation of Section 1 of the Sherman Act.[3]

## IBEW AND NECA DEFENDANTS' MOTION TO STRIKE AND DISMISS

The IBEW and NECA defendants, joined by Local Union 701, have moved to strike or, alternatively, dismiss Premier's complaint. They make three arguments in their motion. First, they contend that Premier's first six requests for relief, which seek injunctive and declaratory relief, are moot because the decision in the Maryland litigation, which granted such relief to the class there, also protects Premier. Second, defendants argue Premier's damages can only be the amount Premier paid into the industry fund. Since they have made an offer of judgment, pursuant to Rule 68, for any amounts Premier has paid, defendants contend that this request for relief is also moot. Finally, defendants argue that Premier cannot state a claim for recovery of the costs of defending the collection actions because the *Noerr-Pennington* doctrine protected defendants' rights to bring those actions. Each of defendants' arguments will be addressed in turn below.

The first argument need not detain the court for long. Defendants contend that most of the relief which plaintiff requests has already been secured by the settlement agreement approved by Judge Murray on July 25, 1983, in the Maryland litigation. That agreement, defendants state, enjoins them from enforcing Article Six against anyone, including Premier. Thus, the request seeking injunctive relief is moot. The request for declaratory relief is also moot, in defendants view, since that request seeks a declaration that Article Six is violative of the antitrust laws, a declaration made superfluous by the judgment and

2. Furthermore, the possibilities of opt-outs reaping the fruits of a "wait and see" attitude are not as sure as defendants suggest, since there are time limits on when the decision to opt-out can be made. *See, In Re Nissan Motor Corp. Antitrust Litigation*, 552 F.2d 1088, 1104 (5th Cir. 1977) (the absentee class member must take action at the "outset of the suit if he or she wishes to be excluded from the class"); *see also Robinson v. Union Carbide Corp.*, 544 F.2d 1258, 1268 (5th Cir.1977) ("class members may not delay the decision to opt-out until the case reaches judgment"); Kaplan, *Continuing Work of the Civil Committee: 1966 Amendments of the Federal Rules of Civil Procedure (I)*, 81 Harvard L.Rev. 356, 397–98 (1967).

3. In its motion for partial summary judgment, plaintiff states that it seeks "summary judgment on the liability of all defendants in this action who were also defendants in the Maryland litigation." The motion further states that these defendants should be estopped to relitigate the legal issues resolved in favor of the plaintiffs in the Maryland litigation. Yet the motion never makes clear what legal issues, in plaintiff's view, were resolved in the prior action. In its memorandum in support of its motion, plaintiff still does not make clear what these "legal issues" are upon which it seeks preclusive effects. In its reply memorandum, plaintiff finally identifies the issue as whether Article Six is a *per se* violation of Section 1 of the Sherman Act. Since both this court and defendants agree that was the only issue decided by the court in the Maryland litigation, it is unnecessary to discuss defendants' arguments on whether the following issues were decided by Judge Murray: (1) whether the IBEW defendants abandoned the alleged conspiracy prior to causation of any damages; (2) whether the defendants were subject to various exemptions from liability; and (3) what, if anything, was the proper measure of damages. Plaintiff has not moved for summary judgment on any of these issues and nothing in this opinion is meant to suggest that defendants are precluded from litigating any of them. This court holds only that all defendants who were parties to the Maryland litigation are precluded from re-litigating the issue of whether Article Six is a *per se* violation of Section 1 of the Sherman Act.

agreement in the Maryland action. In its response to defendants' motion, plaintiff has agreed not to pursue its requests for injunctive and declarative relief. Therefore, the first six requests for relief in Section VII of plaintiff's complaint will be stricken.

Defendants next address Premier's request for damages. They contend that although Premier has not articulated its theory of damages, in defendants' view, the only damages Premier can claim are the contributions it made to the industry fund. According to defendants' records Premier never made any contributions. Nonetheless, simultaneous with the filing of their present motion, defendants have filed an offer of judgment for any amounts Premier can show it paid into the fund. Consequently, say defendants, the only remaining requested relief at issue is the costs and attorneys' fees incurred in defense of the collection actions.

■■■■ This argument fails for two reasons. First, Premier does not concede that its only measure of damages is the fees it paid into the industry fund. Second, Rule 68 does not require that Premier accept defendants' offer of judgment. Rule 68 states that the offer may be accepted by written notice served within ten days of the date the offer is made. If the offer is not accepted, it is deemed withdrawn. Defendants filed the offer of judgment on March 7, 1984. To date plaintiff has not responded to defendants' offer. Therefore, since the offer is deemed withdrawn, the question of this element of plaintiff's damages remains an issue in the case.

Defendants next argue that Premier has failed to state a claim for which relief can be granted based on the costs and attorneys' fees incurred in defending the collection actions. This is so, defendants contend, because plaintiff's claim for such relief ignores defendants' constitutional rights of assembly and petition recognized under the *Noerr-Pennington* doctrine. This court agrees.

The *Noerr-Pennington* doctrine is the result of the holdings in three Supreme Court cases, *Eastern Railroad Presidents Conference v. Noerr Motor Freight, Inc.*, 365 U.S. 127, 81 S.Ct. 523, 5 L.Ed.2d 464 (1961); *United Mine Workers v. Pennington*, 381 U.S. 657, 85 S.Ct. 1585, 14 L.Ed.2d 626 (1965); and *California Motor Transport v. Trucking Unlimited*, 404 U.S. 508, 92 S.Ct. 609, 30 L.Ed.2d 642 (1972). In the last of these, *California Motor Transport*, the Supreme Court squarely held that the right of access to the courts is protected by the First Amendment. *California Motor Transport*, 404 U.S. at 510–511, 92 S.Ct. at 611–612. However, while recognizing a litigant's first amendment right of access to the courts, the Supreme Court also recognized an exception to the *Noerr-Pennington* doctrine—litigation which is abusive of the adjudicative process is not protected. *Id.*, 404 U.S. at 511–513, 92 S.Ct. at 612–613; *see also Hydro-Tech Corp. v. Sundstrand Corp.*, 673 F.2d 1171, 1176 n. 6 (10th Cir.1982). This exception to *Noerr-Pennington* has become known as the "sham" litigation exception.

The Supreme Court left unclear the precise contours of the sham exception.[4] Nor has the Seventh Circuit articulated a general definition of sham litigation. *MCI Communications v. American Tel. & Tel. Co.*, 708 F.2d 1081, 1156 (7th Cir.1983). However, in a recent extensive discussion of the sham exception, the Seventh Circuit analogized sham litigation to the common law torts of malicious prosecution and abuse of process. *Grip-Pak, Inc. v. Illinois Tool Works, Inc.*, 694 F.2d 466 (7th Cir.1982), *cert. denied*, 461 U.S. 958, 103 S.Ct. 2430, 77 L.Ed.2d 1317 (1983). While the *Grip-Pak* panel failed to define sham litigation, the opinion does hold that in order for litigation to be immunized from the anti-

---

**4.** *California Motor Transport* did give some content to the exception, however. The Court stated that the exception includes conduct such as perjury, misrepresentations to the court, conspiracy with judical officials, bribery, or a pat-tern of baseless litigation undertaken to bar competitors from meaningful access to legislative or judicial bodies. 404 U.S. at 513, 92 S.Ct. at 613.

trust laws under the *Noerr-Pennington* doctrine, the litigation must be undertaken with a good faith belief in its merit and for the purpose of obtaining a favorable judgment. *Id.* at 472.

Application of the *Grip-Pak* standard to this case reveals that Premier has failed to state a claim. In an attempt to establish a claim based on the collection actions Premier's complaint states:

(1) NECA, its officers, local NECA chapter officers and Trustees of the NEIF have instituted actions of law against plaintiff to enforce Article Six of the National Agreement, including but limited to the following actions of law against plaintiff. . . .

Complaint, ¶ 15(1). The complaint then cites the three state court collection actions brought against Premier by some of the defendants. Nowhere does Premier allege that these state court actions were undertaken without a good faith belief in the merits of the claims or without a purpose to win a favorable judgment. In fact, it would be difficult for Premier to make such an allegation—the gravamen of Premier's complaint is that, by implementing Article Six, the defendants attempted to get electrical contractors, who were not members of NECA, to pay into the industry fund. It would make little sense to contend on the one hand that defendants conspired to require non-members of NECA to pay into the fund, and on the other hand to argue that the defendants were unconcerned with the outcome of the collection actions that were the means by which defendants attempted to enforce Article Six.

However, Premier argues that *Noerr-Pennington* and its sham exception are relevant only to determining whether particular conduct is violative of the antitrust laws. Since it has already been determined, the argument goes, that Article Six violates Section 1 of the Sherman Act, the only issue is whether the costs and fees incurred in defending the collection actions constitute damages recoverable under the Clayton Act. Here it seems that Premier is not claiming that the collection actions violated the Sherman Act, but rather, that the costs of defending those actions are merely damages which resulted from defendants implementation of Article Six, which does violate the Act. This argument is without merit.

Premier attempts to circumvent *Noerr-Pennington* and the sham exception by labeling the collection actions antitrust damages rather than antitrust violations. Yet Premier presents no explanation of why this labeling makes any difference. In this court's view, it does not matter whether the litigation is seen as itself violative of the antitrust laws or as an outgrowth of other acts which are violative of the antitrust laws. In either instance, defendants' first amendment rights would be burdened by imposing treble damages as a penalty for undertaking litigation. Preservation of the first amendment interests which underlie the *Noerr-Pennington* doctrine must require a showing that the litigation falls within the sham exception, regardless of whether the plaintiff alleges that the litigation is itself an antitrust violation or that the costs of defending against litigation are damages recoverable under the antitrust laws.

To support its argument, Premier has cited a string of Seventh Circuit cases involving patent infringement suits. *See, e.g., Locklin v. Day Glo Color Corp.*, 429 F.2d 873 (7th Cir.1970), *cert. denied*, 400 U.S. 1020, 91 S.Ct. 582, 27 L.Ed.2d 632 (1971); *Hazeltine Research, Inc. v. Zenith Radio Corp.*, 388 F.2d 25 (7th Cir.1967) *aff'd in part and rev'd in part*, 395 U.S. 100, 89 S.Ct. 1562, 23 L.Ed.2d 129 (1969); *Dairy Foods, Inc. v. Dairy Maid Products Co-operative*, 297 F.2d 805 (7th Cir.1961). These cases hold that the cost of defending a patent infringement claim can be recovered in a treble damage antitrust action brought against the patentee. However, all of these cases were decided before the *California Motor Transport* decision, which first applied *Noerr-Pennington* to litigation, and which decision finally explained that the *Noerr-Pennington* doc-

trine is specifically based on the first amendment. As one commentator has suggested, to the extent any of these patent cases can be seen as sanctioning damage awards for litigation without a showing of sham, their continued validity is doubtful after *California Motor Transport. See,* Fischel, *Antitrust Liability for Attempts to Influence Government Action: The Basis and Limits of the Noerr-Pennington Doctrine,* 45 U.Chi.L.Rev. 80, 111–114 (1977).[5]

■ Accordingly, since Premier has made no allegations that the collection actions fall within the sham exception to the *Noerr-Pennington* doctrine, Premier's attempt to recover for its costs and attorney's fees in defending those actions fails to state a claim. Of course, the court recognizes that dismissal of a claim under Rule 12(b)(6) is proper only if "it appears beyond doubt that plaintiff can prove no set of facts in support of his claim which would entitle him to relief." *Conley v. Gibson,* 355 U.S. 41, 45–46, 78 S.Ct. 99, 102, 2 L.Ed.2d 80 (1957). However, this court agrees with that line of cases which holds that it is appropriate to dismiss a claim, such as Premiers, on a 12(b)(6) motion, if the complaint does not adequately allege the elements of the sham litigation exception. Preliminary dismissal is necessary because of the chilling effect which a treble damage claim can have on a defendants' exercise of his or her first amendment rights. *See e.g. Hydro-Tech Corp. v. Sundstrand Corp.,* 673 F.2d 1171, 1177, n. 8 (10th Cir.1982) ("when the discovery burdens of antitrust cases are combined with the threat of treble damages, the prospect of defending an antitrust action can become a most potent weapon to deter the exercise of First Amendment rights"); *Franchise Realty Interstate Corp. v. San Francisco Local Joint Executive Bd. of Culinary Workers,* 542 F.2d 1076, 1083 (9th Cir.1976), *cert. denied,* 430 U.S. 940, 97 S.Ct. 1571, 51 L.Ed.2d 787 (1977) ("the danger that the mere pendency of the action will chill the exercise of First Amendment rights requires more specific allegations than would otherwise be required"). In sum, Premier's claim for its costs and attorney's fees incurred in defending the three collection actions is dismissed pursuant to Rule 12(b)(6) Fed.R.Civ.P.

## MOTIONS OF LOCAL UNION 461 AND LOCAL UNION 176

Defendant Local Union 461 has moved to dismiss the complaint, on the basis of failure to state a claim. In the alternative, Local 461 asks for summary judgment in its favor. In support of its motion this defendant has submitted the affidavit of John Marion, business manager and secretary of Local 461, as well as Local 461's Answers to Interrogatories. Since the court has considered these submissions, which are outside the pleadings, the motion will be treated as one for summary judgment.

Briefly, John Marion's affidavit states that Local 461 never engaged in the conduct of which it is accused in the sections of the complaint relevant to it.[6] In re-

---

5. Nor is the court persuaded by Premier's citation of cases decided after *California Motor Transport.* In all of those cases recovery of litigation costs was conditioned upon a showing that the litigation at issue was within the sham exception. *See, e.g., Colorado Petroleum Marketing Assn'n. v. Southland Corp.,* 476 F.Supp. 373, 379 (D.Colo.1979) (allegations were sufficient to provide a "basis for invoking the 'sham' litigation exception"); *Technicon Medical Information Systems Corp. v. Greenbay Packaging, Inc.,* 480 F.Supp. 124, 127–128 (E.D.Wis.1979) (bringing of lawsuit in "bad faith" and without "probable cause" stated a cause of action under the Sherman Act); *B.A.M. Liquors, Inc. v. Satenstein,* 176–2 Trade Cases ¶ 60, 997 at 69, 413

(S.D.N.E.1976) (bringing of ill-founded litigation is mere sham and not within the *Noerr-Pennington* doctrine).

6. Specifically, he states that: (1) the Local was never involved in the negotiation or implementation of Article Six; (2) that the Local never collected any funds from plaintiff or participated in any way in either the enforcement of Article Six or in the administration of any Article Six funds; (3) that since it was aware of Premier's objections to Article Six, the Local never made any efforts to enforce the payment of Article Six contributions; (4) that this defendant never refused to negotiate with plaintiff, threatened it, refused to refer employees, en-

sponse, Premier does not dispute the facts as stated in John Marion's affidavit. Nor does Premier come forward with any arguments or evidence to suggest that a genuine issue of fact exists as to Local 461's alleged involvement in the conspiracy to violate the antitrust laws. Rather, Premier merely states that without discovery, it cannot present by affidavit the facts necessary to oppose the facts as stated by John Marion. Consequently, Premier argues, the court should refuse to consider Local 461's motion for summary judgment until other depositions have been taken and other discovery has been had on these issues. The court finds Premier's argument unpersuasive.

Rule 56(f) Fed.R.Civ.P. states that a court may refuse to grant summary judgment if the party opposing the motion presents affidavits stating why he cannot present by affidavit facts essential to justify his opposition. If the court finds the stated reasons sufficient, the court may order a continuance of the motion to permit affidavits to be obtained, or depositions to be taken, or other discovery to be had. *See* 6 J. Moore & J. Wicker, *Moore's Federal Practice*, ¶ 56.24 (2d ed. 1982). Apparently, Premier attempts to invoke the court's discretion under Rule 56(f), even though plaintiff's request is stated in its memorandum in opposition to the motion, rather than by affidavit as required by the Rule.

■ The court will not rest its decision of this motion on Premier's technical failure to properly invoke Rule 56(f). Premier's request would still be inadequate even if it were stated in the form of an affidavit. The court notes that Premier's response to Local 461's motion was filed May 15, 1984, more than three and a half years after Premier filed the first complaint in this action. Premier gives no reasons why it

has been unable to conduct sufficient discovery in that three and a half years. Moreover, it has now been more than a year since the Local's motion was fully briefed, yet Premier has made no attempt to file any affidavit to supplement its May 15, 1984, response to the Local's motion. It should also be pointed out that in Premier's status report filed on July 25, 1985, as a result of this court's order, no mention is made of any additional discovery necessary to respond to Local 461's motion. Premier seems content to rest its opposition to the motion on the mere recitation of the language of Rule 56(f) without setting forth any facts upon which the court can conclude that plaintiff has not had an adequate opportunity for discovery. This recitation is not enough to invoke the court's discretion under Rule 56(f). Since Local 461's submissions show that it has not been involved in any way in the alleged antitrust conspiracy against Premier, Local 461 is entitled to summary judgment in its favor and is dismissed as a defendant from this lawsuit.

Next, Local Union 176 argues that it too is entitled to summary judgment. In support of its motion, Local 176 contends that plaintiff's only allegations of acts of Local 176 in furtherance of the alleged conspiracy are that the Local refused, and threatened to refuse, to refer electricians to plaintiff and threatened to engage in slow downs and other forms of harassment. *See* ¶ 15(n) of Second Amended Complaint. Local 176 points to the affidavit of Michael Hughes, submitted by Premier in support of a motion for preliminary injunction brought by Premier on February 24, 1981. Attached to the Hughes affidavit is a copy of an opinion issued by the Appellate Court of Illinois, Third District (1980), *Colgan v.*

gaged in intimidations, work slowdowns, boycotts, or any other forms of harassment against Premier; that the Local never approached Premier or any other non-NECA contractor to reopen existing labor agreements so as to amend them to include Article Six's industry fund requirements; and finally (5) that this defendant has never instituted or participated in any court

collection actions against plaintiff for payments due under Article Six, nor has the Local ever demanded that Premier comply with the challenged provision of Article Six. Therefore, the Local 461 defendant argues, there is no genuine issue of fact as to whether it is liable to Premier for any violation of the Sherman Act.

*Rae-Ann Electric Co., et al.,* 91 Ill.App.3d 386, 47 Ill.Dec. 227, 414 N.E.2d 1343 (1980) (consolidated). Local 176 further argues that, in the *Colgan* decision, the Illinois Appellate Court ruled that Local 176 had not engaged in any of the acts alleged in ¶ 15(n) of the plaintiff's Complaint.

 Premier responds that the allegations in Complaint ¶ 15(n) are not the only acts of which Local 176 is accused. The court notes that ¶ 15(h)(i) and (m) are also directed at the local union defendants, including Local 176. These paragraphs allege acts other than those in ¶ 15(n). Unlike Local 461, Local 176 has not presented evidence to show that it has not engaged in the acts complained of in the other subparagraphs of the complaint. Therefore, even if Local 176 has not engaged in the conduct described in ¶ 15(n), it has not addressed the other relevant allegations of Premier's complaint and therefore cannot receive summary judgment in its favor.

### CONCLUSION

In summary, for the reasons stated above the court's ruling is as follows:

(1) Premier's motion for summary judgment based on collateral estoppel is granted; defendants are barred from relitigating the issue of whether Article Six of the National Agreement is a *per se* violation of Section 1 of the Sherman Act;

(2) the motions of defendants' IBEW, NECA and Local Union 701 to strike Premier's request for injunctive and declarative relief is granted; these defendants' motion to strike the general claim for damages, however, is denied;

(3) the motion to dismiss the claim for attorney's fees and costs incurred in defense of the collection actions is granted;

(4) the motion of Local Union 461 for summary judgment is granted; Local 461 is dismissed from this action;

(5) Local Union 176's motion for summary judgment is denied.