**GRIP–PAK, INC., Ernest R. Cunningham, and Michael Kovac, Plaintiffs,**

v.

**ILLINOIS TOOL WORKS, INC., Defendant.**

No. 77 C 2688.

United States District Court, N.D. Illinois, E.D.

Aug. 29, 1986.

Joel Bennett, Kendrick, Netter & Bennett, Los Angeles, Cal., Richard Rappaport, Leslie Locke, Ross & Hardies, William Schur, Chicago, Ill., for plaintiffs.

Earl Pollock, Gary Senner, Robert T. Joseph, Jay Conison, Sonnenschein Carlin Nath & Rosenthal, Chicago, Ill., for defendant.

## MEMORANDUM OPINION AND ORDER

GETZENDANNER, District Judge:

This action under Sections 1 and 2 of the Sherman Act and Sections 3, 4, 7, and 16 of the Clayton Act, 15 U.S.C. §§ 1, 2, 14, 15, 18, and 26, respectively, is before the court on the motions of defendant Illinois Tool Works (ITW) for summary judgment and

for sanctions under Rule 11. The complaint arises out of allegedly anticompetitive conduct on the part of ITW in monopolizing the market for plastic multi-pack can carriers and in excluding plaintiffs Grip-Pak, Inc., Michael Kovac, and Ernest Cunningham from entering the market. The chief action of which plaintiffs complain is defendant's filing of an allegedly baseless state court lawsuit against them for breach of fiduciary duty and theft of trade secrets. This lawsuit allegedly disrupted their business relationships with several would-be licensees and prevented them from raising the capital necessary to compete in the plastic carrier market.

The current motion for summary judgment raises four legal disputes: 1) whether Grip-Pak was sufficiently prepared to enter the multi-pack carrier market so as to recover lost manufacturing profits; 2) whether Grip-Pak's claim of lost profits is in any event speculative; 3) whether plaintiffs' claim for damages from ITW's filing of a state court lawsuit against them is barred under the *Noerr-Pennington* doctrine; and 4) whether ITW's filing of a patent application in 1973 constituted fraud on the patent office so as to sustain an antitrust claim in connection with that filing. For the reasons set forth herein, the motion for sanctions is denied, and the motion for summary judgment is granted in part.

This motion is ITW's third and final motion for summary judgment in this action. An earlier opinion by Judge Parsons granting summary judgment was reversed by the Seventh Circuit. *Grip-Pak v. Illinois Tool Works, Inc.*, 694 F.2d 466 (7th Cir. 1982), *cert. denied*, 461 U.S. 958, 103 S.Ct. 2430, 77 L.Ed.2d 1317 (1983). In that decision, the Seventh Circuit held that 1) plaintiff need not be a manufacturer of plastic six-pack holders to collect damages for its exclusion from that market if it was prepared to enter the market within a reasonable time; and 2) a prior state court finding that defendant's suit was not malicious did not bar a claim that the suit was unlawful under the federal antitrust laws. The case was remanded to Judge Parsons for consideration of whether Grip-Pak had made a sufficient showing that it was prepared to

enter the market within a reasonable time so as to collect antitrust damages for being excluded.

ITW's renewed motion for summary judgment on remand was denied on September 19, 1984. Judge Parsons nonetheless advised the parties that a further motion might yet be proper. The case was reassigned to my calendar on November 23, 1984, and on January 31, 1985, I gave defendant leave to file a final motion for summary judgment upon completion of certain discovery. The motion was filed on May 22, 1985, and became fully briefed 5½ months later. During the briefing of these motions, ITW also filed a motion for Rule 11 sanctions based on plaintiffs' alleged misrepresentation of the deposition testimony of ITW's general counsel Robert Beart. The court will discuss that motion first, as it affects the factual record on the summary judgment motion.

### Motion for Sanctions

ITW's motion for sanctions arises out of plaintiffs' assertions in their summary judgment papers that Robert Beart, ITW's former Senior Vice-President and General Counsel, admitted during deposition questioning that the real purpose of ITW's trade secret action against Grip-Pak was to interfere in the latter's business relationships. In particular, the dispute concerns whether Beart answered "absolutely" or "absolutely not" when asked if the real purpose of the suit was to affect Grip-Pak's ability to consummate a burgeoning relationship with Anheuser-Busch. The parties have filed affidavits from the court reporter and from the various attorneys present at the deposition.

Defendant has accused plaintiffs' counsel of deliberately distorting the record, and plaintiffs in turn have accused defense counsel of belatedly trying to correct a damaging admission. The court cannot resolve these charges without creating a satellite litigation and thereby frustrating the disposition of the underlying case. Moreover, the court is uninclined to inquire into the matter further, since the affidavits all point to a genuine mistake. The court's

own interpretation of the record is that there was some genuine confusion over what Beart said, but that he intended to answer "absolutely not," and that the court reporter mistakenly pressed an asterisk which, under her computerized program, automatically deleted the word "not" from the transcript. Beart corrected the mistake, but, for reasons which are unclear, his handwritten (as opposed to typed) corrections did not get properly forwarded to the court reporter the first time around, and never got properly forwarded to plaintiffs' counsel. Plaintiffs' counsel, Leslie Locke, no doubt aware that the admission seemed unlikely, double-checked with the court reporter before filing his response to the present motion. She advised him of a probable error in transcription but her answer was not definitive, and Locke then chose to rely on the answer as reported.

■ Despite room for other conclusions, the court finds that Locke's conduct in calling the court reporter is inconsistent with any knowledge on his part that the statement had in fact been corrected by the deponent, and that Locke's reliance on what he thought was an uncorrected admission, even though he might have suspected that the deponent misspoke, does not violate Rule 11. The court nonetheless concludes that, for purposes of the summary judgment motion and the future record in this case, the misdelivered corrections should be incorporated into the record. Beart obviously intended to answer "absolutely not," and defense counsel's correspondence indicates a genuine belief that the full set of corrections had been sent to plaintiffs' attorneys. The court considers it irrelevant whose negligence caused the misdelivery of the corrections.

### Facts

The court notes at the onset of this discussion that it has relied wholly on the deposition excerpts and documents appended to the parties' Rule 12 statements of facts and not the statements themselves. The reason for noting this is that the plaintiffs' statement contains many assertions which are unsupported by the *factual* record. That record, interpreted in the light most favorable to plaintiffs, is as follows. ITW is a corporation engaged in the multi-packaging business. Since the late 1950's, ITW, through its Hi-Cone Division, has been in the business of manufacturing, selling, and leasing plastic multi-pack carriers for cans and machines for applying such carriers to cans. These carriers include the familiar plastic ring device used to hold together six-packs of canned beverages.

Traditionally, beer carriers were supplied by one group of companies, and assembly machines for attaching the carriers to cans were supplied by another. ITW changed that relationship by marketing carriers and assembly machines together as a single system. No other competitor supplies assembly machines to the trade, and the only major competitor in the plastic can carrier market is ITW's licensee, Owens-Illinois. There is evidence that ITW and Owens-Illinois representatives used to be engaged in price-fixing discussions.

ITW does not license Owens-Illinois or anyone else to supply its machines, and supplies them to the trade on a lease-only basis. At one time, its leases prohibited use of the machines with non Hi-Cone carriers; the current leases prohibit alteration or modification of the machines without ITW's consent. Plaintiffs have testified that this prohibition makes it more costly and difficult to design competing can carriers for use with ITW's machines.

During the period involved in this lawsuit, ITW together with Owens-Illinois enjoyed a market share ranging from 50% to 85% of the plastic can carrier market. The high share is partly explicable by certain patents ITW holds. Plaintiffs allege that this dominance is due to ITW's policy of buying up patents it doesn't intend to use and then vigorously enforcing those patents against would-be entrants into the market. As of 1977, ITW owned about 110 U.S. patents related to the Hi-Cone carrier, many acquired from outsiders.

Plaintiff Grip-Pak, Inc., a successor in interest to a partnership called ERC & Associates, was formed in March 1972 by

plaintiffs Ernest R. Cunningham and Michael Kovac, former employees of ITW. Kovac was employed by ITW from July 1, 1963 to February 12, 1971 as a patent attorney. Cunningham was employed by ITW as an engineer from October 22, 1962 to November 1, 1968. Both men worked in the multi-packaging division of the business.

At the time of Grip-Pak's incorporation, Kovac was a practicing lawyer in St. Louis, Missouri, and Cunningham worked for Barr-Stalford. Neither worked full-time for Grip-Pak, but continued their other jobs. They formed Grip-Pak to exploit Cunningham's plastic carrier and carrier assembly machine inventions. Cunningham had invented and filed patent applications on a plastic bottle carrier ("Grip-Pak I") and a plastic can carrier ("Grip-Pak II"). Three United States patents issued to Cunningham on Grip-Pak I in 1974, and two United States patents on Grip-Pak II in 1974 and 1976. The facts of this motion concern Grip-Pak's efforts to market these two products and the effect that ITW's conduct had on these efforts.

### Grip-Pak I

Grip-Pak I is a "cold stretch" multi-pack carrier for glass bottles which Cunningham invented in 1969. This carrier uses an envelope of blown plastic film, which is molded into the shape of a bottomless bag and stretched over the necks of a group of bottles. The natural tension of the film secures the bottles in the carrier. Previous bottle carriers had been made of cardboard, and Cunningham considered that Grip-Pak I would be less costly to manufacture and more safe than cardboard carriers, since dropped or exploded bottles would break inside the protective plastic film. Neither Grip-Pak I nor any other cold-stretch multi-pack bottle carrier has ever been sold on a commercial basis.

In 1972, Cunningham designed and fabricated a small handoperated assembly machine to package bottles in the Grip-Pak I carrier. This machine was operable and used at a packaging show in May 1973 to display Grip-Pak I to potential customers. That machine could not have been used,

however, to assemble packages on a commercial production run basis. Grip-Pak did not have any machine to apply its bottle carriers on a production run basis until after 1977, when Yanamura agreed to fabricate a semi-automatic assembly machine in exchange for the right to manufacture and sell Grip-Pak I in the Far East. Yanamura manufactured the machine sometime around 1979, but the business relationship between Grip-Pak and Yanamura didn't go any further.

Beginning in July of 1971, Cunningham and Kovac met with Owens-Illinois ("Owens") representatives to discuss Grip-Pak I. By September 1971, Owens concluded it was seriously interested in an option and licensing arrangement, the basic terms of which were for Owens to give Grip-Pak $10,000 for developing samples and an applicating machine usable for conducting market tests. Owens would aid in the production of the samples, and Grip-Pak would commence work on a single head powered applicating machine. If the option were exercised, Owens would then have paid an additional $60,000 to Grip-Pak plus royalties of 2 to 5 percent. Owens concluded that Grip-Pak's proposed selling price would justify a $400–million investment. Grip-Pak never developed the applicating machine, despite an estimate that it needed only two weeks to develop a prototype, and no deal was ever reached.

In December 1971, Cunningham demonstrated Grip-Pak I and a hand assembly machine to several ITW executives, including Robert Beart. At a June 1972 meeting, Beart pointed out various ITW trade secrets he felt were reflected in Grip-Pak I. Kovac and Cunningham showed him why the alleged secrets or confidences didn't apply, and the subject was dropped thereafter. ITW subsequently asked Kovac to submit a written license proposal. Kovac proposed a joint venture, and ITW counterproposed to pay Kovac and Cunningham a $3,000 monthly consulting fee, which they rejected.

In early 1972, Grip-Pak finally did enter into an option agreement with Union Car-

bide with respect to Grip-Pak I. Union Carbide paid $5,000 for the option. On or about May 9, 1972, Union Carbide wrote Grip-Pak that, although Grip-Pak I "appear[ed] to be technically feasible, capital costs and marketing economics presage commercial failure for this project." Union Carbide therefore declined to exercise its option. The letter noted in passing that ITW was also working to develop plastic bottle carriers. Grip-Pak claims that the bottle carrier supposedly in development at ITW was in fact Grip-Pak I, but the evidence cited to support this allegation does not support this claim.

On August 29, 1972, Cunningham and Kovac met again with ITW. The parties subsequently began negotiating an agreement whereby ITW would obtain a sole and exclusive right and option on Grip-Pak I for an unspecified period. The agreement called for a $10,000 option fee to be paid to Grip-Pak for development expenses, and called for a $125,000 minimum royalty payment in the event ITW thereafter exercised its option. ITW never purchased the option, and by November of 1972, Grip-Pak decided to postpone development of "Grip-Pak I" until "Grip-Pak II" had been successfully introduced into the market.

Grip-Pak did meet with Owens-Illinois again on May 29, 1973, to discuss Grip-Pak I. Although Owens representative R.J. Heier described Cunningham and Kovac as "dreaming," Owens executive C.D. Gray believed the concept had merit. Gray recommended putting off any deal, however, in light of ITW's then pending court action to enjoin Grip-Pak from marketing Grip-Pak I. The record is silent on whether Grip-Pak attempted to renegotiate arrangements with Owens after it won the suit.

**Grip-Pak II**

In early 1972, Cunningham invented and filed for United States patents on a scrapless plastic can carrier which was subsequently named Grip-Pak II. Unlike conventional plastic carriers, which are manufactured through a "cookie cutter process" and thus create scrap material (usually remelted for future use), the Grip-Pak II method of manufacturing produces no scrap. The carrier is produced by joining a strip down the center of a plastic tube to form two distinctive bands or tubes called "Siamese tubes." The flattened Siamese tube is then die-cut by alternately slitting the top and bottom webs. When pulled open, the cut tubing forms pairs of round holes for cans.

Because Grip-Pak II produces no scrap in the manufacturing process, the product promised significant cost savings over the traditional cookie-cutter carrier. Nonetheless, there have never been commercial sales of Grip-Pak II (or any other scrapless-type carrier) to people who can soft drinks or beer. Whether this failure is due to the product's inherent flaws or to ITW's monopolistic conduct, is in many ways the crux of the dispute in this case.

One of the first companies contacted by Grip-Pak was ITW, which learned about Grip-Pak II in May 1972 and saw a sample the following month. On May 30, 1972, Kovac wrote Cunningham about the desirability of establishing that ITW had no ownership rights or prior development in the product. No trade secret problems regarding Grip-Pak II were apparently discussed, however. The parties thereafter briefly corresponded about development of Grip-Pak II, but never got to the proposal stage.

In July 1972, Kovac and Cunningham contacted executives at Anheuser-Busch, and showed them Grip-Pak II. Cunningham told Anheuser-Busch that Grip-Pak II could be run on ITW's Hi-Cone applicating machines by building a separately mounted adaptor machine to open up the Grip-Pak II carrier and put it on the ITW assembly. This adaptor machine existed only as a concept of Cunningham's but Cunningham, who invented the Hi-Cone machines, is confident that such an adaptor could be built. The record suggests that, *if* such an adaptor could be built, Grip-Pak II could be applied to cans on ITW's Series 200 machines, which were still being used by some of ITW's customers at that time. At some point thereafter, ITW switched the design of its machines to a Series 500. This latter

machine is useless for applying Grip-Pak II to cans.

Letters and discussions with Anheuser-Busch continued. On September 15, 1972, Anheuser-Busch sent Grip-Pak an outlined program for developing Grip-Pak II. Kovac replied with a written proposal on December 27, 1972, followed by subsequent written proposals in April and May of 1973. In the agreement, the parties contemplated that Anheuser-Busch would make available a Hi-Cone carrier applicating machine for Grip-Pak's use in developing a "commercially acceptable" product. The agreement set forth "specific levels of development" for Grip-Pak to meet, including submission of 50,000, 500,000, and 1,000,000 Grip-Pak II carriers (at a price of $7.98 per thousand) for three series of functional evaluations and market tests.

At this time, Grip-Pak had no facilities for manufacturing Grip-Pak II. Under the agreement, Anheuser-Busch had no obligation to make test shipments until it determined that the carriers were commercially acceptable, had no obligation to buy any carriers beyond the development period, and could cancel the contract at any time. Kovac testified that Busch was not obliged to buy any carriers which didn't work. The agreement was to be signed at a May 29, 1973 meeting.

At the meeting, Kovac and Cunningham informed various Anheuser-Busch personnel that they had been sued by ITW. According to Kovac, Charles Koenig, Anheuser-Busch Assistant Director of Purchasing, told Kovac that he wouldn't sign the agreement until Anheuser's legal personnel had assessed the lawsuit situation. Koenig testified in his deposition in this action, however, that Anheuser-Busch continued to consider a development program with Grip-Pak subsequent to the lawsuit, but was not interested in signing any agreement until Grip-Pak had a supply of carriers to use in the development program. Grip-Pak never supplied Anheuser-Busch with such carriers.

During the same period it negotiated with Anheuser-Busch, Grip-Pak negotiated and eventually entered into an agreement with Packaging Industries ("PI") whereby the latter was granted a nonexclusive license to make, use and/or sell Grip-Pak II machinery. PI had concluded that the proposed manufacturing and storage costs would make Grip-Pak II a feasible product, and also felt that Grip-Pak II's feature of perforations (leaving the plastic rings on each can) avoided the disposal problems of the Hi-Cone carriers after usage.

The contract was signed in March 1973 and provided in pertinent part that PI would develop at its own expense an extruder line with a "Tubular Water Bath" cooling system as promptly as practicable after Grip-Pak's submission of written reasonable performance specifications. This method would then be used to manufacture the Siamese tubing necessary for Grip-Pak II. Grip-Pak agreed to manufacture the cutting die for each production line. The first die would be sold to PI for $30,000; subsequent dies would be sold at cost plus 25%. Under the agreement, PI agreed to pay an annual minimum royalty of $50,000, to be paid six months after the first commercial sale of Grip-Pak II carriers and annually thereafter. Grip-Pak knows of no other company which has ever manufactured Siamese tubing.

In May of 1973, Grip-Pak and PI displayed the Grip-Pak II can carrier at a national packaging show at McCormick Place in Chicago, and demonstrated how it could be used on a set of jaws from an ITW assembly machine. Over 150 domestic and foreign companies requested information.

**ITW's Response: The Lake County Suit**

When ITW officials learned that Grip-Pak I and Grip-Pak II were being disclosed to the public at the May 1973 trade show, they decided to file a lawsuit against Grip-Pak, Kovac, and Cunningham. The stated purpose of the lawsuit was to protect ITW's property interest in and rights to certain secrets and confidential information which they felt Kovac and Cunningham had used in developing Grip-Pak I and II. The lawsuit was authorized by Silas Cathcart, ITW's CEO, upon the advise of outside legal counsel and of ITW's then gener-

al counsel, Robert Beart. Both of these ITW representatives have maintained throughout this case that the purpose of the lawsuit was as alleged in the complaint, i.e., to protect ITW's property.

The lawsuit also named PI as a defendant. ITW had no personal knowledge of wrongdoing on PI's part, but named it as a defendant in view of its involvement with Grip-Pak at the May 1973 trade show. An internal memo prepared by ITW's outside counsel in June of 1973 reflects that Grip-Pak I resembled a bottle carrier conceived by Beart, to which Kovac had been exposed; and that Cunningham, while at ITW, had discussed in a brain-storming session the concept of making a plastic can carrier from a tube of plastic, which is the way Grip-Pak II is made. Finally, ITW representatives expressed to counsel that Grip-Pak II resembled a carrier invented by Ron Owen, an ITW product engineer, in 1969. That product had been shown to Kovac back then, and he had recommended patenting if there was commercial interest.

The Owen invention is similar to Grip-Pak II in that both involve slitting a plastic tube which then pulls apart to form a "scrapless" carrier device. Owen's device as disclosed in 1969 was intended for cardboard boxes rather than cans, however, involved a single side tube as opposed to two narrow ones, and was in certain other respects unlike Grip-Pak II. As of May 1973, ITW had never prepared a patent application on the project. Owen conceived this device after Cunningham had left ITW. Plaintiffs claim that Beart knew this fact, but the deposition testimony only supports the inference that the fact didn't occur to Beart at the time of filing suit, allegedly because he viewed Kovac and not Cunningham as the chief culprit.

The parties put on a 21-day bench trial in July and August of 1974. At the close of ITW's case, Grip-Pak, Cunningham and Kovac moved to dismiss its claims. The trial court denied the motion. The parties submitted proposed findings of fact and conclusions of law. On November 14, 1974, the court ruled in favor of Grip-Pak, Cunningham and Kovac. The judge declined to enter a finding that ITW had acted mali-

ciously in filing suit. The Seventh Circuit has held that this finding has no collateral estoppel effect in this case. The trial court on February 24, 1975, denied Grip-Pak's post-trial motion for fees incurred in defending allegations made without reasonable cause and not in good faith. In November, 1976, the Illinois Appellate Court affirmed the trial judge's entry of judgment and his decision to deny Grip-Pak's motion for fees; the Illinois Supreme Court denied review on March 31, 1977.

In October, 1976, while the ITW case was on appeal, ITW commenced a second lawsuit against Grip-Pak in Paris, France, realleging many of the claims it made in the 1973 trade secret suit and requesting the French court to assign Grip-Pak's French patents to it. ITW had been advised that, had this suit not been filed by November 23, 1976, it would lose its ability to get future relief if the Lake County judgment were reversed in its favor. Within a month of the French filing, the Lake County case was affirmed on appeal; when the Illinois Supreme Court denied review, ITW instructed its French solicitors to dismiss its writ. Kovac was informed of this development by his French counsel in a letter dated April 29, 1977. The lawsuit was not formally dismissed until July 1977, however, by which date Grip-Pak had filed the present action.

During this same time period, ITW attorney Edward Benno wrote to ITW's Swedish patent counsel that the Grip-Pak patent "resulted from the outright thievery, breach of conract, and breach of fiduciary relationship of two of our former employees." The letter referred to the filing of the French and American lawsuits, but did not mention the trial court's decision except for the following statement: "We are now before our State Court of Appeals with our legal action and we expect a favorable decision ... by the end of this year." Grip-Pak alleges that the manifest purpose of this letter was to deceive ITW's Swedish attorneys about the true facts of the Lake County suit.

Sometime after losing the trial, ITW also changed its assembly machine and carrier pricing structure. Previously, ITW had charged a flat monthly rental fee for assembly machines regardless of usage. In 1975, however, ITW added a usage charge to the lease agreements, but lowered the list price of its plastic carriers by about $1.00 per thousand, or ten percent. This change shifted costs from the carriers to assembly machines, thus reducing the cost advantages of competing plastic carriers such as Grip-Pak which were designed for use with the Hi-Cone assembly machines, and increasing costs in the area where ITW enjoyed a monopoly.

**ITW's Response: The Ron Owen Patents**

Around the same time it decided to file suit against Grip-Pak, ITW also decided to act to protect its interests in the Ron Owen invention, which Grip-Pak II resembled. Owen first saw the Grip-Pak II invention at the McCormick Place trade show and immediately noted its similarity to his earlier disclosure. He shared this reaction with Edward Benno, an ITW patent attorney. The two of them met with Beart, who engaged the law firm of Olson, Trexler, Wolters, Bushnell & Fosse, Ltd. to prosecute a patent application pertaining to the Ron Owen invention.

Richard Trexler of the Olson, Trexler firm was the attorney responsible for the form and contents of the Ron Owen patent application. Trexler was aware in preparing the application that a patent application had been filed on the Grip-Pak II structure, although he did not know in whose name, and that Kovac had had familiarity with the Ron Owen invention. Trexler was concerned that public disclosure of Grip-Pak II might establish a bar to the patentability of the Ron Owen invention, but he also believed (correctly) that the Ron Owen invention antedated the Grip-Pak II invention and (incorrectly) that Grip-Pak II was in fact derived from the Ron Owen invention. The basis for his belief was Kovac's knowledge of the Ron Owen invention and Kovac's role as patent attorney or possibly inventor of Grip-Pak II.

In Trexler's opinion, Owen's patentable invention involved both a method for slitting plastic tubing *and* the tubing created by use of the method. He drafted the claims accordingly, and included in his application two figures which showed a device formed by use of the method of slitting when applied to a pair of joined, parallel tubes. This application generates a double-row six-pack carrier product much like Grip-Pak II. In Trexler's opinion, these figures (7 and 8) showed a preferred embodiment, or best mode, of the invention, as is proper to disclose in a patent application.

Because the public disclosure of Grip-Pak II represented a potential bar to patentability, Trexler believed that an interference proceeding should be sought for the purpose of establishing that the Ron Owen invention antedated the invention of Grip-Pak II and that the latter was derived from the former. Trexler believed that a prerequisite to the Patent Office's declaring an interference is substantial similarity between the interfering applications. Because he believed that the Grip-Pak II application claimed or disclosed a double-row carrier product, he believed it was necessary and desirable to disclose a double-row carrier product substantially similar to Grip-Pak II and therefore included figures 7 and 8 for that purpose as well.

On May 11, 1973, Ron Owen signed the patent application as the inventor. The patent was assigned to ITW. Owen told Richard Grace, an ITW salesman, that Beart had argued for including the double tube figure in the application as a logical extension of the single tube concept, which Owen had disclosed in 1969. According to Grace, Owen added that he had felt "intimidated" by Beart into signing the application. Owen in his deposition denied having made such a remark, but the court will accept the remark as true for purposes of this motion.

On May 14, 1973, Trexler filed the Owen application with the Patent Office and asked the office to declare an interference between Owen's application and the Grip-Pak application. No interference was de-

clared between the two applications. Trexler believes that the lack of an interference was caused by Kovac's decision to withdraw from the Grip-Pak II application all claims that might have conflicted with claims and disclosures contained in Owen's application. The patent Examiner then reached the conclusion that the common subject matter was unpatentable over the prior art.

On August 7, 1974, the patent Examiner determined that the method and article claims of the Owen application should be prosecuted separately; ITW decided to prosecute only the article claims. The Examiner further required ITW to select for prosecution the claims readable on only one of the following species: the carrier reflected in figures 1–4; that reflected in figures 5–6; or that reflected in figures 7–8. ITW elected the species of figures 1–4. Figures 3 and 4 of the application show a carrier slit alternately from side to side so as to form an unstepped carrier; figures 5 and 6 show an alternative procedure for unfolding the carrier to form a stepped carrier. The 1969 disclosure reflects only the stepped version, and plaintiff contends that Owen's sample cannot be transformed into figures 3 and 4 by mere physical manipulation. While the cited portions of the record do not support this assertion, apparently Trexler at his deposition was unable to figure out how the unfolding worked. If plaintiffs' charge is true, then only figures 5 and 6 of the application would have been actually reduced to practice before filing.

On October 25, 1974, the Examiner rejected several claims as unpatentable on the basis of Cunningham's Grip-Pak II patent. In order to overcome this rejection, the Olson, Trexler firm filed a Rule 131 affidavit to show that the Ron Owen invention antedated the filing date of Cunningham's Grip-Pak II application. Attached to the Rule 131 affidavit was a complete copy of the Ron Owen disclosure. On November 14, 1974, the Lake County Circuit Court included in its findings of fact that ITW had derived figures 7 and 8 from Cunningham's Grip-Pak II invention. Trexler informed the Patent Office of this particular

finding, but added that "[a]pplicant does not agree with these findings...."

On or about March 19, 1975, the Examiner removed Cunningham's patent as a reference and allowed one of ITW's claims in the Owen application, subject to amendments. In July 1975, he rejected the amended claims but allowed one newly-added claim, and made his determination final. His action was upheld by the Board of Appeals on May 26, 1977, and later by the Court of Customs and Patent Appeals. The Board of Appeals expressly considered the specific holding of the Lake County court and found them not relevant. Trexler informed the court of appeals of the appellate decision several months after it was issued.

Around the same time ITW appealed the Examiner's rejection of its original claims, it filed a divisional application for a rewritten version of some of those claims. Upon initial action, the Examiner allowed two claims but rejected a third as unpatentable in view of Grip-Pak II. To overcome the rejection, Trexler refiled the Rule 131 affidavit. On or about February 23, 1977, the Examiner directed ITW to submit a factual description of exactly what was done with the Ron Owen invention between its 1969 reduction to practice and the 1973 filing of the patent application.

In response, ITW filed affidavits from Beart and from Robert Rettig, a vice president of ITW, which indicated that ITW had not publicly disclosed the Owen invention except in discussing its general structure with Personal Products, Inc. The affidavits also stated that ITW had not done anything with the Owen invention due to a lack of required machinery but had not intended to abandon the invention. Finally, Beart's affidavit stated that the filing was prompted by the discovery that Cunningham and Kovac "were in the process of making a public disclosure of an invention which in the opinion of counsel was in conflict with and constituted an appropriation of the Ron Owen invention hereof." Trexler, on or about May 6, 1977, submitted a copy of the appellate court deci-

sion affirming the trial court's findings and reiterated the position that "applicant does not agree with a number of the rulings made...."

On or about October 11, 1977, the Examiner concluded that ITW had not attempted to sell the Ron Owen invention for public use, and had not willfully suppressed or concealed it. The Examiner allowed three claims in the divisional application in early 1978, and a patent including those claims was issued in August of that year. In addition to procuring the two United States patents, ITW also successfully prosecuted several foreign patents on the Ron Owen invention. In 1975, it obtained patents in New Zealand and Australia; in 1977, it obtained patents in Great Britain, Italy, and France. In 1979, it obtained patents in Belgium and Sweden. Each of these patents contains disclosures on figures 3, 4, 7, and 8 of the May 1973 application. ITW has never commercially developed its patents on the Ron Owen device.

As noted earlier, Grip-Pak narrowed its own patent application in response to these claims and ITW's request for interference. Kovac also believes that Owen's patents dominate Grip-Pak II and preclude him and Cunningham from making or licensing the manufacture of Grip-Pak II here and abroad. Trexler, however, believes that ITW's Canadian patent would dominate Grip-Pak II because Grip-Pak withdrew its competing patents there, but not ITW's French patent, and has not otherwise expressed the view that ITW's patents dominate Grip-Pak II. ITW has never sued or threatened to sue Grip-Pak for infringement of the Ron Owen patents, and Grip-Pak has never asked ITW for its views on the matter. Neither party has put forth evidence to explain how Owen's invention could dominate Grip-Pak I in view of the Patent Office's initial conclusions that the similarities were unpatentable, but perhaps the later removal of Grip-Pak as a reference would explain the possible domination.

Owen left ITW's employ sometime around 1975. He and a former ITW salesman Richard Grace thereafter discussed going into competition with ITW, but were afraid of being sued. Owen told Grace he was on a consultant retainer from ITW, but that he wasn't doing any consulting. Grace testified that Owen is untruthful, and insinuated that the retainer was possibly some sort of bribe.

## Post–1973 Attempts to Manufacture and/or License Grip-Pak I & II

Grip-Pak has alleged that ITW's lawsuit, by draining its financial resources and diverting executive time, prevented the successful development of Grip-Pak I and II. ITW has argued on this motion that Grip-Pak cannot, as a matter of fact and law, prove it had the financial and technical wherewithal to begin manufacturing efforts, and that its claims for lost profits must be stricken for failure of proof.

The undisputed facts which inform this debate are as follows. Grip-Pak's 1972 Income Tax Return, which covered the taxable year ending April 30, 1973, showed total assets of $743.62 and income of $5,000 before deductions. Grip-Pak's return for the subsequent year indicated assets of $9,446.14, most of which was cash, and zero income. Both returns showed that no compensation was paid to either Cunningham or Kovac, that Cunningham devoted 50% of his time to the business, and that Kovac devoted 0% of his time to it. The assets of Grip-Pak, apart from amounts allocated to patents, have been less than $15,000 for most of its history, but have gone up to $54,000. During this same period, Kovac has not worked full time for Grip-Pak, and Cunningham only worked full time for Grip-Pak for several months in 1973.

Grip-Pak's internal business plans for 1974 and 1975 reflected that full-scale production of Grip-Pak II would have required around $500,000 in funding. While outright licensing of Grip-Pak II, with no retained rights to manufacture and sell the carriers, would have required only minimal expenses, as of May 1972 Grip-Pak was not interested in licensing, and four years later when Coors sought to buy Grip-Pak outright, plaintiffs refused. What funds Grip-Pak did have in this period were apparently used to pay legal expenses. From 1973–

1977, Grip-Pak incurred $264,692.50 in legal fees and around $25,000 in trial-related expenses. As of July 1981, Grip-Pak had paid $129,187.26 of this debt, and owed $265,867.24 (presumably including interest).

As noted earlier, ITW's suit had two immediate negative effects on Grip-Pak's business: Owens-Illinois put off negotiations regarding a tentative deal for licensing Grip-Pak I, and Anheuser-Busch delayed signing an option regarding Grip-Pak II. The Owens-Illinois deal was not firm, however, and Grip-Pak at that time had decided to postpone development of Grip-Pak I until Grip-Pak II had been successfully introduced into the market. As noted earlier, Yanamura eventually fabricated a commercial assembly machine for Grip-Pak I. The machine was never commercially used, however, because marketing experts advised Grip-Pak that the introduction of foam shields on nonreturnable bottles lessened the attractiveness of a cold stretch wrap carrier. As of 1984, Grip-Pak I still had never been commercially sold or even tested.

Kovac's testimony permits the inference that the Anheuser-Busch development agreement regarding Grip-Pak II would have been signed on May 29, 1973 but for ITW's lawsuit, and that Grip-Pak would then have had a guaranteed purchase of 1,550,000 carriers for testing purposes at a cost of $7.98 per thousand *if* it could have manufactured them to Busch's satisfaction. By that date, Packaging Industries, Grip-Pak's licensee, had designed and fabricated a machine capable of manufacturing about 30 feet of Grip-Pak Siamese tubing per minute. Jon Glydon of PI testified, however, that PI could service only a fraction of Anheuser-Busch's needs at that time. Moreover, before the carriers could be manufactured, Grip-Pak needed to develop a die cutter for slitting the tubing into carriers and to develop an assembly machine whereby the product could be applied to cans on a production run basis, neither of which it had.

Grip-Pak never developed such an assembly machine. Its intent was to run Grip-Pak II carriers on Hi-Cone equipment, and Cunningham had a concept for a machine which would open up the Grip-Pak samples and put them onto the jaws of a Hi-Cone Series 200 applicating machine. Although he never actually built such a machine or even designed it on paper, he is confident that it could be built. ITW's position on the similar Ron Owen inventions supports Cunningham's belief: ITW felt that the Ron Owen carriers, if successfully developed, could be applied to cans on existing Hi-Cone machinery. Cunningham did demonstrate Grip-Pak II carriers on Hi-Cone jaws at the May 1973 trade show, but the carriers have never been commercially run on Hi-Cone machines. Sometime after 1973, ITW modified its machinery from a four-jaw design to a two jaw/depressor plate design. Grip-Pak II cannot be run on this new machinery.

By May of 1973, Cunningham also had no commercial die cutter, but had fabricated a prototype rotary die cutter (subsequently patented) from which he later produced several thousand Grip-Pak II carriers some time in the fall of 1975. The success of the die cutter was a source of friction between Grip-Pak and PI. On October 30, 1973, Cunningham criticized PI's failure "to produce Siamese tubing in accordance with our March 23, 1973 license agreement," and cancelled the license. Kovac also felt at that time that PI's process had not produced an acceptable commercial form. PI responded in December that "the type of cutting being done with your cutting devices is [according to outside chemical analysts] the biggest problem in maintaining the integrity of the package." The letter referred to the fact that "once a nick or tear is started, there is nothing to prevent it from continuing to tear." On January 24, 1974, the parties worked out their differences and the letter of cancellation was withdrawn. By November 24, 1974, Kovac had concluded that PI's Siamese tubing met Grip-Pak's performance specification.

Grip-Pak, meanwhile, did not manufacture a production line die cutter until sometime in 1975 or 1976, when Anatoliy Popow, a tool and die maker, manufactured a production die at a cost of about $30,000.

Popow later accepted Grip-Pak voting stock as payment. In August 1975, Kovac informed PI that it could obtain a production die for that price. Kovac said that Grip-Pak's own production cutting die system was not in operation due to financial difficulties, and that it was unable to make samples at that time. Jon Anthony Glyon of PI responded that he wanted to know the basis on which Kovac thought the new cutting die was operable, since PI was still willing to utilize the original cutting device. In October, Kovac wrote back that Grip-Pak would guarantee any cutter to produce Grip-Pak II to PI's specifications, but that the first cutter was for Grip-Pak's own use and could not be borrowed. In February 1976, Glydon wrote Cunningham:

> The reason that I had said use your original cutter was because you represented to us and we relied on the fact that that cutter worked. Now we know for the first time that it does not work, and we would therefore have to assume that any new cutting device will also not work.

Cunningham responded in March that Grip-Pak had not operated the production die due to financial limitations, but was still prepared to provide and guarantee a production cutting die to PI upon receipt of a firm written order and carrier specifications. PI never placed either a firm order or specifications, and on May 10, 1976 filed suit against Grip-Pak, Cunningham, and Kovac, accusing them of never having developed or supplied a die as obligated to do under the license agreement. Grip-Pak filed an answer and counterclaim alleging PI's failure to place a firm order and to manufacture acceptable tubing. The suit was settled on or about March 19, 1977, and the parties declared their previous agreements to be null and void.

Glydon, as well as the plaintiffs, is of the opinion that the ITW lawsuit poisoned the Grip-Pak and PI relationship, and prevented them from successfully entering the plastic multi-pack carrier market. According to both parties, the chief reason Grip-Pak could not produce the cutting die was lack of funds, and the chief reason for lack of funds was ITW's lawsuit. At one point,

PI did not pay Grip-Pak a $50,000 royalty due to its legal expenses. It is unclear, however, whether Grip-Pak made any efforts at obtaining financing. Grip-Pak had almost no assets at the time suit was filed and Kovac testified that Grip-Pak intended not to seek outside funding but to rely on its stockholders for additional equity contributions. From 1972–75, these stockholders contributed $90,000 to Grip-Pak, $30,000 of which is attributable to the Popow die cutter. At least one of the stockholders testified that the legal expenses formed a chief part of his reluctance to contribute more money.

In 1975, MorAmerica, Inc., a venture capital firm, offered Grip-Pak $300,000 in exchange for a 25 percent share of its equity. MorAmerica wanted personal guarantees from Kovac and Cunningham, however, which they were afraid of giving because of substantial personal debt. Accordingly, plaintiffs turned down the offer.

ITW's lawsuit also affected Grip-Pak's relationship with PI in areas other than financing. In October 1973, Cunningham criticized PI for its failure to meet certain lawsuit obligations. Glydon at his deposition testified that the lawsuit embittered Cunningham, and caused him to look at everyone as enemies. PI's own legal costs created further tensions, and ITW refused to provide or discuss providing assembly machines to PI during the period that PI remained a defendant in the suit. An agreement to provide such a machine was apparently negotiated in settlement of ITW's suit against PI.

Other efforts to develop Grip-Pak II continued despite the filing of the ITW lawsuit. Beginning in or around June 1973 and continuing through December 1975, Grip-Pak had a series of contacts with Mead Packaging to discuss the possibility of Mead becoming a licensee or joint venturer with respect to Grip-Pak II. On December 17, 1975, Mead advised that, in its opinion, the Grip-Pak II carrier lacked "package integrity" and would offer no substantial cost advantage over the Hi-Cone carrier. Mead also wrote that it did

not believe a feasible and cost-effective production process could be achieved on the basis of Grip-Pak's present position. Although Kovac attempted to re-interest Mead in a development program on July 29, 1977, when ITW's appeals from the lawsuit had been exhausted, Mead did not accept the offer.

Negotiations between Grip-Pak and Anheuser-Busch also continued after the filing of the ITW lawsuit. In December 1973, Chuck Koenig of Anheuser-Busch told Kovac that there were "various ramifications" which could result should Busch pursue its test program with the threat of the ITW lawsuit, and nothing happened for a while. Grip-Pak informed Koenig in November 1974 that it had been exonerated from ITW's charges and was in the process of completing its first production line. On or about December 11, 1974, Koenig sent Grip-Pak a draft development program proposal, much along the lines of the May 1973 proposal: i.e., Anheuser-Busch would at its option make test shipments and market tests of the Grip-Pak II carriers at such time as the carriers were deemed commercially acceptable. Anheuser-Busch would not know whether Grip-Pak would or would not qualify as a supplier until the test program was conducted and evaluated, and was not interested in signing an agreement until Grip-Pak came with a supply of carriers for use in the development program. Grip-Pak never came to Anheuser-Busch with such carriers.

In September 1975, Grip-Pak again contacted Anheuser-Busch and Anheuser-Busch wrote back to confirm its continued interest in a revival of a market test program for Grip-Pak II. Kovac and Cunningham were in debt, however, and problems between Grip-Pak and PI prevented Grip-Pak from reviving the test market agreement with Anheuser-Busch at that time. Grip-Pak then proposed a joint venture agreement, but withdrew this offer and proposed a program instead which would allow Anheuser-Busch to self-manufacture Grip-Pak II carriers. Anheuser-Busch did not enter into the proposed program.

In 1975 and 1976, Grip-Pak met with Jeffrey Coors, vice-president of research and development for Coors Brewery. Coors has always made its own can carriers. On April 14, 1976, Coors referred to the "risk involved with Grip-Pak," specifically, the risk of liability for any patent infringement or other actions taken against Grip-Pak as reasons for not entering into a joint venture agreement. Since Grip-Pak had no money to absorb such a judgment or to fund the development, Coors said it "would feel much more comfortable owning outright the technology for Grip-Pak II." Coors offered Grip-Pak $200,000 plus a royalty of ten cents per 1,000 carriers, subject to Board approval, and estimated that this proposal once developed would yield Grip-Pak $1,000,000 per year. Kovac and Cunningham turned down the offer since they still intended to manufacture and sell Grip-Pak II carriers themselves.

In 1975, Grip-Pak also sought to interest Atlas Plastics in a joint venture relating to Grip-Pak II. Atlas's president M.L. Christensen believed that Grip-Pak II was still in the developmental stage, and not commercially available for sale, and had been told by Kovac that Grip-Pak did not have the capability to manufacture Grip-Pak II. Atlas Plastics nonetheless found sufficient value in Cunningham's carrier inventions and technical abilities to enter into a joint venture with an initial capital of $150,000; $75,000 of which was risk-capital contributed by Atlas, and $75,000 of which represented patent rights contributed by Grip-Pak. The agreement also gave Atlas an option to acquire a half-interest in the Grip-Pak II patents. Atlas never exercised its option, however, and on September 9, 1977, Kovac wrote to Christensen terminating those option rights. The letter refers to an interest on Atlas's part in negotiating a settlement of the ITW lawsuit (presumably this antitrust lawsuit, as the state court suit was resolved by that date). Grip-Pak declined Atlas's offer to do so.

In or about June 1982, Grip-Pak, Kovac, Cunningham and others formed a limited partnership with about $100,000 of equity and loans and began marketing profitably a conventional "cookie cutter" can carrier called Grip-Pak 207.5/209. Thus, as of

1984, although plaintiffs have begun profitable manufacturing efforts, Grip-Pak II has still never been commercially sold or tested on a production run basis.

### Motion for Summary Judgment

As noted earlier, defendant's summary judgment motion raises four issues, two of which go to liability, and two of which go to the plaintiffs' ability to prove damages. The court will begin its analysis with the liability issues, even though this is not the order in which the defendant has presented them.

### Whether Plaintiffs' Claims Based on the Lake County Suit are Barred by the Noerr-Pennington Doctrine

The *Noerr-Pennington* doctrine derives its name from two Supreme Court cases in which efforts to obtain or influence governmental actions were held immune from antitrust scrutiny. In the first of these cases, *Eastern Railroad Presidents Conference v. Noerr Motor Freight, Inc.,* 365 U.S. 127, 81 S.Ct. 523, 5 L.Ed.2d 464 (1961), the Supreme Court held that an allegedly malicious and fraudulent campaign to pass anticompetitive legislation could not form the basis for a Clayton Act claim. Relying on legislative history of the Sherman Act as well as the first amendment right to petition the government, the court held that bona fide action to influence legislation is a form of protected activity, even if "the sole purpose in seeking to influence the passage and enforcement of laws is to destroy the [plaintiffs] as competitors...." *Id.* at 138–39, 81 S.Ct. at 530. The principle was then reaffirmed in *United Mine Workers v. Pennington,* 381 U.S. 657, 85 S.Ct. 1585, 14 L.Ed.2d 626 (1965): "[j]oint efforts to influence public officials do not violate the antitrust laws even though intended to eliminate competition." *Id.* at 670, 85 S.Ct. at 1593. Litigation against competitors is considered a form of petition for redress within the meaning of this doctrine. *California Motor Transport Co. v. Trucking Unlimited,* 404 U.S. 508, 510, 92 S.Ct. 609, 611, 30 L.Ed.2d 642 (1972).

Despite the strong first amendment concerns in protecting the right of petitioning the government, the courts have consist-

ently held that litigation which is based on intentional falsehoods or on knowingly frivolous claims does not enjoy the antitrust immunity conferred by the *Noerr-Pennington* doctrine. *See California Motor Transport,* 404 U.S. at 513, 92 S.Ct. at 613; *MCI Communications Corp. v. AT & T,* 708 F.2d 1081, 1155–56 (7th Cir.), *cert. denied,* 464 U.S. 891, 104 S.Ct. 234, 78 L.Ed.2d 226 (1983). The rationale of these cases is that activity "ostensibly directed toward influencing governmental action" may come under antitrust scrutiny if the so-called petitioning amounts to a "mere sham" directed towards interfering with the business relationships of a competitor. *Noerr Motor Freight, Inc.,* 365 U.S. at 144, 81 S.Ct. at 533. Even a single lawsuit or claim can be "sham litigation" actionable under the antitrust laws. *MCI,* 708 F.2d at 1154.

Consistent with this rationale, the Seventh Circuit has repeatedly expressed the *California Transport* standard as centering around the *genuineness* of the defendant's attempt to influence governmental action. *See, e.g., MCI,* 708 F.2d at 1156 (requisite motive for the "sham exception" to *Noerr-Pennington* immunity is intent to harm one's competitors not by the *result* of litigation but by the simple *fact* of litigating); *Havoco of America, Ltd. v. Hollobow,* 702 F.2d 643, 650 (7th Cir.1983) (anticompetitive motive behind petitioning activity irrelevant so long as challenged action constitutes "a genuine attempt to influence governmental action." The principle is perhaps nowhere more clearly expressed than in the Seventh Circuit's prior decision in this case. *Grip-Pak, Inc. v. Illinois Tool Works, Inc.,* 694 F.2d 466 (7th Cir.1982), *cert. denied,* 461 U.S. 958, 103 S.Ct. 2430, 77 L.Ed.2d 1317 (1983). The Court held that a lawsuit might be actionable under the antitrust laws even though supported by probable cause. Drawing on analogies between "sham litigation" and the common law tort of abuse of process, Judge Posner expressed the distinction as follows:

This is not to say that litigation is actionable under the antitrust laws merely because the plaintiff is trying to get a monopoly. He is entitled to pursue such

a goal through lawful means, including litigation against competitors. The line is crossed when his purpose is not to win a favorable judgment against a competitor but to harass him, and deter others, by the process itself—regardless of outcome—of litigating.

694 F.2d at 472. Because Judge Parsons had granted summary judgment on a different rationale, however, the Court reversed without examining whether that line had been crossed in this case.

Defendant maintains that plaintiffs have not demonstrated, and cannot demonstrate, that it did not truly seek a judgment in its favor in filing the Lake County suit. The weight of the evidence certainly supports ITW. ITW's executives have consistently testified that the purpose of the Lake County suit was to protect secrets and confidences which they felt Kovac and Cunningham (particularly Kovac) had knowingly breached. The evidence further suggests that the ITW employees knew at the time they filed suit that Grip-Pak I and II bore certain resemblances to unmarketed ITW concepts which Kovac undoubtedly knew about in the course of his work as an ITW patent attorney. There is no direct evidence that these executives deliberately filed suit with knowledge that the suit was baseless in law or in fact; and both Cunningham and Kovac admitted at their depositions that, to their knowledge, ITW truly sought to win the Lake County suit.

Plaintiffs nonetheless offer the following evidence to support the inference of such bad faith. First, plaintiffs claim that ITW representatives met with Kovac and/or Cunningham many times prior to May 1973 to discuss the possible licensing of Grip-Pak I and II but only once during those meetings insinuated that these products properly belonged to ITW. Suit was instead filed only after the McCormick Place trade show; the timing lends credence to plaintiffs' allegation that the suit was intended, at least in part, to cast a cloud over plaintiffs' activities as well as to get a judgment against them. Beart testified in his deposition that he only became concerned about Grip-Pak when he discovered that Kovac and Cunningham were showing the "secret" product to the public at the trade show. Plaintiffs have evidence, however, that Beart knew as early as December 1971 that Kovac and Cunningham were disclosing Grip-Pak I to potential customers, and knew by November of 1972 that Kovac had shown Grip-Pak II to both Anheuser-Busch and Union Carbide.

Second, plaintiffs have produced affidavits from some ITW employees who claim that some of the so-called trade secrets allegedly stolen were commonly regarded by ITW employees as not trade secrets due either to abandonment, public disclosure, or lack of commercial utility. Third, plaintiffs note that ITW had no actual knowledge of wrongdoing on the part of PI but named it as a co-defendant because of its ongoing commercial relationship with Grip-Pak. Fourth, ITW executives probably knew at the time of filing suit that Cunningham, and not Kovac, was the inventor of Grip-Pak I and II, and that Cunningham had left ITW before the Ron Owen invention, on which Grip-Pak II was allegedly based, had been reduced to paper. Fifth, in deciding whether to appeal the trial court's decision, ITW's lawyers expressly considered how appealing or not appealing would affect Grip-Pak's present and future ability to market Grip-Pak II and other competitive products.

The plaintiffs have also argued other evidence, most of which is irrelevant. For example, plaintiffs rely extensively on the factual findings of the state trial and appellate courts that ITW had "no" evidence of an actual breach of confidence. These findings, however, are only marginally relevant, if at all, to what ITW reasonably believed at the time it filed suit. *See California Motor Transport*, 404 U.S. at 513, 92 S.Ct. at 613 (opponents readily call other side's claims "baseless"); *Handgards, Inc. v. Ethicon, Inc.*, 743 F.2d 1282, 1292 (9th Cir.1984), *cert. denied*, 469 U.S. 1190, 105 S.Ct. 963, 83 L.Ed.2d 968 (1985) (fact that litigant lost a prior suit does not establish that the suit was brought in bad faith). The facts are particularly irrelevant here, since the same courts which made these

remarks declined to award Grip-Pak its legal fees for defending a "bad faith" suit.

Plaintiffs have also offered evidence of other anticompetitive acts to bolster their claim of bad faith: specifically, the evidence of ITW's patent acquisitions and enforcement efforts, including one patent which ITW employees acknowledged as a spurious modification of an old patent, and an infringement suit that ITW lost against Ray Brunsing. ITW threatened some other competitors with patent suits and, in so doing, successfully kept those competitors out of the market. There is no evidence, however, that these threats were baseless or that the lost infringement suit was brought in bad faith.

Plaintiffs argue that these other acts are relevant in that the Lake County suit was a constituent part of an overall scheme to monopolize and is therefore not immune under *Noerr-Pennington*. This argument misstates the law. In *Pennington*, the Supreme Court held that genuine efforts to influence governmental action are not illegal *"either* standing alone *or* as part of a broader scheme itself violative of the Sherman Act." 381 U.S. at 670, 85 S.Ct. at 1593 (emphasis added). The cases relied on by plaintiffs simply stand for the unremarkable proposition that petitioning activity which is part of an overall illegal scheme cannot confer immunity on the defendant's other, unprotected, activities. *See Clipper Express v. Rocky Mountain Motor Tariff Bureau*, 690 F.2d 1240, 1263 (9th Cir.1982), *cert. denied*, 459 U.S. 1227, 103 S.Ct. 1234, 75 L.Ed.2d 468 (1983).

The chief case suggesting the contrary is *Kobe, Inc. v. Dempsey Pump Co.*, 198 F.2d 416 (10th Cir.), *cert. denied*, 344 U.S. 837, 73 S.Ct. 46, 97 L.Ed. 651 (1952). That opinion suggests that even good faith prosecution of a patent infringement action may violate the Sherman Act if done in furtherance of and as an integral part of a monopolistic scheme. The case predates *Noerr-Pennington* and does not discuss the first amendment, but continues to be cited with approval. *See Grip-Pak*, 694 F.2d at 473. *Kobe* concerned a company which monoplized the rodless pump industry by buying up all patents in the field, by obtaining covenants not to compete from the sellers, and by using its market power to exclude all competitors from the field. The infringement suit in question was accompanied by a customer boycott against the plaintiff. Although the court found that the defendant had truly believed its patents to be infringed, the acquisition of the patents itself was implicitly found to be in violation of the antitrust laws.

Whether *Kobe* remains good law today is not wholly clear. What is clear, however, is that cases following *Kobe* have emphasized the "consistent threat of the patent suit being used with ulterior motives as a predatory means ... as opposed to its being used as a defensive shield with which to protect the patent interests." *Rex Chainbelt, Inc. v. Harco Products, Inc.*, 512 F.2d 993, 1005 (9th Cir.), *cert. denied*, 423 U.S. 831, 96 S.Ct. 52, 46 L.Ed.2d 49 (1975). This formulation is consistent with *Noerr-Pennington*, and, significantly, courts have only applied *Kobe* where infringement action was integral to an independent antitrust violation, such as an unlawful tying scheme, or was used to extract a monopoly beyond the terms of the patent grant. *See generally Handgards, Inc. v. Ethicon, Inc.* (Handgards I), 601 F.2d 986, 994 (9th Cir. 1979), *cert. denied*, 444 U.S. 1025, 100 S.Ct. 688, 62 L.Ed.2d 659 (1980); *Rex Chainbelt, Inc. v. Harco Products, Inc.*, 512 F.2d 993, 1005–06 (9th Cir., 1975); *Cole v. Hughes Tool Co.*, 215 F.2d 924, 934–36 (10th Cir.), *cert. denied*, 348 U.S. 927, 75 S.Ct. 339, 99 L.Ed. 726 (1954).

Despite the similarity between the facts in *Kobe* and certain of plaintiffs' allegations in this case, plaintiffs have made little effort to explain how ITW's trade secret action against Grip-Pak was integral to its actions in acquiring patents from outsiders and using its monopoly power over assembly machines to extend its monopoly in the carrier market. Instead, plaintiffs refer to the overall scheme as bearing only on ITW's intent. Under *Noerr-Pennington*, however, anticompetitive intent is irrelevant to lawsuits which are brought solely to obtain a favorable judgment. Accordingly, the court has considered only the

relevance of ITW's other activities to its alleged intention to harass Grip-Pak through filing suit.

■ Plaintiffs' showing after nine years of discovery is unimpressive. The court nonetheless concludes that the evidence of possible bad faith is sufficient to withstand a Rule 56 motion. ITW's overall activities lend some support to the claim of over-reaching, and ITW's willingness to negotiate for rights to products which it later claimed belonged to it entirely casts some doubt on its motives in making the latter claim. While ITW may be guilty only of laches, such business conduct is unusual, to say the least, and plaintiffs have demonstrated some basis for impeaching Beart's deposition explanation of the delay. The court recognizes that plaintiffs' evidence is further weak in that ITW and Grip-Pak did discuss possible trade secret violations with regard to Grip-Pak I, and did not actually negotiate over Grip-Pak II. But the record overall is sufficiently ambiguous and dependent on Beart's credibility that trial would be the preferred course.

ITW suggests that the issue of Beart's credibility should not preclude summary disposition, since both Kovac and Cunningham at their depositions admitted under cross-examination that what ITW sought in its lawsuit was favorable judgment, whereby it would get all rights to Grip-Pak I and II. Kovac in particular referred to Beart as a "good man" who "overreached." Kovac also testified that Beart "knew" the trade secrets were fake, however. Construing all inferences in plaintiffs' favor, the court cannot conclude that plaintiffs will be unable at trial to take the issue of Beart's motives in filing suit to the jury.

### Fraud on the Patent Office

Grip-Pak alleges that the filing of the Ron Owen patent application constitutes the perpetration of a fraud upon the United States Patent Office because ITW knew that its figures depicting a double tube carrier were not part of the Ron Owen disclosure of invention and, in fact, had been directly appropriated from Cunningham's Grip-Pak II invention. Grip-Pak claims that the patent "dominates and

blocks Plaintiff from making its Cunningham Grip-Pak II invention" and requests in its pleadings a judgment of patent invalidity. ITW argues that there is no evidence of fraud and that the claim is invalid in any event since ITW has never enforced the Owen patents against Grip-Pak.

The chief, if not sole, factual support for Grip-Pak's motion is Judge Van Deusen's finding in the Lake County suit that "the double tube device shown in figures 7 and 8 of the Ron Owen patent application was derived by plaintiff and Ron Owen from Cunningham's Grip-Pak II invention." This derivation is explained in the present record. Trexler stated that the figures were deliberately drawn up to be similar to Grip-Pak II for the purposes of ensuring that an interference would be declared. Defendant does not concede, however, that it "copied" the figures from Grip-Pak II, rather it included the double row as an obvious and logical extension of Owen's earlier product. ITW also points out that the patent Examiner required ITW to make its claims readable on only one of three configurations, and that ITW chose figures 1–4, *not* 7–8. Therefore, the double tube carriers shown in the figures are not part of the actual patent claims, but merely a "best mode" illustration of the product's usefulness. This latter interpretation is further buttressed by the fact that the Patent Office considered the similarities between Grip-Pak II and the Ron Owen device to be unpatentable in view of the prior art, and issued patents on both carriers.

■ The law is fairly well settled that obtaining a patent by means of fraud on the Patent Office can violate section 2 of the Sherman Act providing that the other elements of a § 2 violation are present. *Walker Process Equipment, Inc. v. Food Machinery & Chemical Corp.*, 382 U.S. 172, 174, 86 S.Ct. 347, 350, 15 L.Ed.2d 247 (1965); *Brunswick Corp. v. Riegel Textile Corp.*, 752 F.2d 261, 265 (7th Cir.1984), *cert. denied*, 472 U.S. 1018, 105 S.Ct. 3480, 87 L.Ed.2d 615 (1985). Fraud is defined as "knowingly and willfully misrepresenting facts to the Patent Office" and must be

based on "clear, unequivocal and convincing" evidence. *Walker Process,* 382 U.S. at 177, 86 S.Ct. at 350; *Loctite Corp. v. Ultraseal, Ltd.,* 781 F.2d 861, 875 (Fed.Cir. 1985); *Scott Paper Co. v. Fort Howard Paper Co.,* 432 F.2d 1198, 1204 (7th Cir. 1970), *cert. denied,* 401 U.S. 913, 91 S.Ct. 882, 27 L.Ed.2d 812 (1971). Technical fraud or omissions are insufficient.

■ ITW shows persuasively that Grip-Pak's claims regarding the absence of figures 7 and 8 from the 1969 disclosure are patently without merit: the Patent Office's attention was specifically directed to the fact that the competing Grip-Pak II application was on file and an interference was requested to establish the priority of the Owen invention. Owen's 1969 disclosure was also filed with the Patent Office, and nothing in ITW's patent application suggests that figures 7 and 8 appear in that disclosure. Finally, ITW's counsel promptly informed the Patent Office of Judge Van Deusen's finding. The Board of Appeals in turn found the judge's findings and holding irrelevant.

The fact that figures 3, 4, 7, and 8 were not reduced to practice also fails to show fraud within the meaning of *Walker Process.* The application refers to figures 3 and 4 as "a carrier constructed in accordance with one embodiment of the present invention" and refers to figures 7 and 8 as "a modified form of the present invention." Nothing in the application purports to say that such figures have been reduced to practice. ITW further submitted a factual record about what was done with the invention from 1969 to date of filing which nowhere pretends that ITW had reduced to practice anything more than the invention described in the 1969 disclosure document.

ITW's failure to highlight a potential weakness of its patent application does not constitute fraud when all the material facts which would enable the Patent Office to address the issue were disclosed. Plaintiffs claim that ITW abandoned the invention, but have no evidence that the relevant ITW officials specifically considered the invention to be permanently abandoned at the time. (The Wanderer affidavit, which addresses trade secrets generally, does not mention the Owen invention.) Plaintiffs also claim that ITW committed fraud by stating that "applicant does not agree" with the Lake County court's findings when Owen had not been consulted on the subject. This argument is frivolous: Trexler was authorized to set forth Owen's views and Owen later adopted the view as his own.

### Grip-Pak's Ability to Collect Lost Profits as Damages

In this case, Grip-Pak has sought as damages not only its legal expenses in defending the Lake County suit but the lost profits it allegedly would have made from manufacturing Grip-Pak I and II but for ITW's anticompetitive acts. In his earlier decision granting summary judgment, Judge Parsons had ruled that Grip-Pak could not recover profits from a product it had never manufactured or sold. The Seventh Circuit reversed, and held that a plaintiff unlawfully excluded from a market need not actually have begun manufacturing efforts in order to collect damages, so long as it can "show that it intended to enter and was prepared to do so within a reasonable time." *Grip-Pak, Inc. v. Illinois Tool Works,* 694 F.2d 466, 475 (7th Cir.1982), *cert. denied,* 461 U.S. 958, 103 S.Ct. 2430, 77 L.Ed.2d 1317 (1983). The Court further observed that Grip-Pak's evidence of preparedness was "quite thin" but left the matter for the district court to decide. On remand, Judge Parsons denied ITW's renewed motion for summary judgment on the ground that prospective buyers had ceased to have interest in Grip-Pak as a result of ITW's suit.

Essentially, plaintiffs' theory of the case is that but for ITW's decision to file suit against them in May 1973 and to prosecute the Ron Owen patent, they would have begun profitably manufacturing both Grip-Pak I and II some time ago. ITW has argued that the claim for such lost profits is without factual basis, since Grip-Pak never commenced the numerous steps required for actual manufacture of the products in question (indeed never even hired

full-time employees), and since neither product has ever been shown to be commercially feasible.

■ Generally, an antitrust plaintiff excluded from a market by anticompetitive activity is entitled to recover as damages the difference between what it would have made in a hypothetical free market and what it actually made. *Dolphin Tours v. Pacifico Creative Service*, 773 F.2d 1506, 1511 (9th Cir.1985). The plaintiff may measure these damages by reference to its profits before and after the illegal activity, by examining the profits of a comparable business not affected by the anticompetitive activity, and by projecting the market share it would have attained absent the anticompetitive activity. *Id.* The damages must be proved with reasonable certainty, and may not be based on mere speculation. *Olympia Equipment Leasing Co. v. Western Union Telegraph Co.*, 797 F.2d 370, 381–383 (7th Cir.1986); *Independence Tube Corp. v. Copperweld Corp.*, 691 F.2d 310, 328 (7th Cir.1982), *rev'd on other grounds*, 467 U.S. 752, 104 S.Ct. 2731, 81 L.Ed.2d 628 (1984); *Webb v. Utah Tour Brokers Association*, 568 F.2d 670, 677 (10th Cir.1977).

■ Where, as here, an antitrust plaintiff has not actually entered the relevant market and the product in question has not been marketed, the first two of these measures are unavailable, and a plaintiff is forced to rely on the projection of its expected market share in a hypothetical free market. Because the dangers of "quantifying lost hopes" can be even greater in this context than in that of an established business, however, courts have required such nascent businesses to prove "intention and preparedness" to enter the relevant market: only a plaintiff who takes substantial demonstrable steps to enter an industry can recover projected lost profits as antitrust damages. *Solinger v. A & M Records, Inc.*, 586 F.2d 1304, 1309 (9th Cir.1978), *cert. denied*, 441 U.S. 908, 99 S.Ct. 1999, 60 L.Ed.2d 377 (1979).

■ The standards for determining whether a plaintiff without actual experience in a particular market meets the "intention and preparedness" test were first set forth in the case of *Waldron v. British Petroleum*, 231 F.Supp. 72 (S.D.N.Y.1964). In that case, the court framed the inquiry as whether the plaintiff had demonstrated an "injury to business or property" within the meaning of section 4 of the Clayton Act, and observed that courts generally require some varying combination of the following four factors: 1) background and experience in the prospective business; 2) affirmative action to engage in the same; 3) ability to finance the business; and 4) consummation of contracts. *Id.* at 81–82.

The inquiry is in part one of standing—whether the plaintiff can prove an injury to business or property—and in part one of proof—whether the plaintiff can prove damages with reasonable certainty. The inquiry is highly fact-specific. In *Bubar v. Ampco Foods, Inc.*, 752 F.2d 445 (9th Cir.), *cert. denied*, 472 U.S. 1018, 105 S.Ct. 3481, 87 L.Ed.2d 616 (1985), the court granted summary judgment to the defendant where the plaintiff, a would-be purchaser of defendant's business, lacked any binding contract and had firm financing commitments for only $300,000 out of a necessary $3.8 million. A similar result was reached in *Hayes v. Solomon*, 597 F.2d 958 (5th Cir. 1979), *cert. denied*, 444 U.S. 1078, 100 S.Ct. 1028, 62 L.Ed.2d 761 (1980), where the plaintiffs had taken few steps beyond solicitation of an initial proposal to enter the line of business from which they were allegedly excluded, and offered no evidence to show an ability to secure $14,000,000 in funds without which they could not have commenced operations. The court ruled that plaintiffs could not recover for "so ethereal a project" and overturned the jury's verdict.

In *Indium Corp. of America v. Semi-Alloys, Inc.*, 611 F.Supp. 379 (N.D.N.Y.), *aff'd*, 781 F.2d 879 (Fed.Cir.1985), the plaintiff filed suit based on defendant's allegedly fraudulent enforcement of patents in the market for solder preforms used in packaging electronic components. The court granted summary judgment based on the plaintiff's lack of manufacturing expertise with regard to the product in question and its failure to acquire any necessary

machinery. The plaintiff attempted to argue that it could have subcontracted these tasks, but the court rejected that claim in light of evidence that the plaintiff had never explored, let alone attempted, to hire such subcontractors.

Two cases coming out the opposite way are *Parks v. Watson*, 716 F.2d 646 (9th Cir.1983), and *Neumann v. Vidal*, 710 F.2d 856 (D.C.Cir.1983). In *Parks*, the plaintiff had taken no demonstrable steps for entry into the off-site geothermal heat business, but had acquired two tracts of property with geothermal wells which it planned to use for onsite heating, hired expert consultants, developed economic projections and engineering plans, and secured a commitment of venture capital and a lease permit from the state. The court held that the plaintiff had shown preparedness as to the onsite business. In *Neumann*, the plaintiff complained of anticompetitive litigation which excluded him from the market for manufacturing earth retaining walls. Although the plaintiff had never sold any retaining walls, the court found that his knowledge of the needs in that business and his prior success in operating other businesses allowed an inference of preparedness. The plaintiff had estimated his business capital needs at only $30,000, and the court relied on affidavits from outside investors who said that, but for the defendant's anticompetitive acts, they would energetically have pursued financing possibilities with the plaintiff.

In the present case, the first of the *Waldron* factors—experience and background in the prospective business—weighs heavily but not determinatively against the plaintiffs. Plaintiffs had no prior experience in operating a business when they incorporated Grip-Pak II, never developed regular operations, and never even hired employees. To some extent this lack of experience and development is balanced by their technical expertise in the plastic carrier field and their ownership of the two patents the value of which they claim was destroyed. Plaintiffs have testified that the plastic carrier business generally requires little start-up money, and offer their post–1980 experience in manufacturing

conventional carriers as evidence of that fact. Accepting this as true, however, it remains to be seen whether this experience is relevant to their business as of 1974–1977, when they sought to develop only Grip-Pak I and Grip-Pak II, two previously untested products.

With respect to Grip-Pak I, the court readily concludes that plaintiffs have proven insufficient evidence of intent and preparation which would entitle them to damages for lost profits from the sale of that product. According to plaintiffs' own submission, Grip-Pak I was invented in 1969, four years before ITW filed the Lake County suit against them, and was "marketable for profit in 1971." Grip-Pak I has never been commercially produced, however, and the plaintiffs never took affirmative steps to manufacture Grip-Pak I. Rather, they sought to license others to manufacture and sell the product, without success. The only actual agreement entered into with regard to Grip-Pak I was an option agreement which Union Carbide eventually chose not to excercise in May of 1972 due to factors of "capital costs and marketing economics." Plaintiffs testified that they had ceased efforts at actively marketing Grip-Pak I shortly thereafter. After the suit was over, plaintiffs were free to market Grip-Pak I without the threat of a patent suit from ITW, and were eventually able to subcontract the manufacture of a commercial assembly machine for the product in the late 1970s. The product itself was never sold, however, due to advice from marketing gurus that there was no commercial interest in shrink-film carriers. Indeed, no such carrier has ever been sold on a commercial basis to the knowledge of any of the parties in this case.

The only evidence suggesting any antitrust damages relating to this product is a memo from C.D. Gray of Owens-Illinois, dated June of 1973, in which he expressed the view that the concept for Grip-Pak I had "merit" but that any deal should be put off in light of ITW's then pending court action. There is no evidence, however, that the Owens agreement would probably have been signed but for the suit,

or that the agreement would have been profitable. Any receipt of royalties would have been totally dependent on Grip-Pak's ability to develop a marketable product, evidence of which there is none.

 Indeed, although Grip-Pak has put forth proposed expert testimony that the projected profits from Grip-Pak II can be estimated or extrapolated from ITW's market share, it has offered no method whatsoever for estimating the profits Grip-Pak I would have generated, and spends almost no time in its brief elaborating this point. Thus, even were there some more evidence of commercial promise or development of the product, profits at this point would be based on sheer speculation. The Supreme Court has recently emphasized that the standard for granting summary judgment mirrors the standard for a directed verdict, and that consequently a motion for summary judgment may be granted on a complete failure of proof concerning an essential element of a nonmoving party's case. *Celotex Corp. v. Catrett*, —— U.S. ——, 106 S.Ct. 2548, 2553, 91 L.Ed.2d 265 (1986); *Anderson v. Liberty Lobby*, —— U.S. ——, 106 S.Ct. 2505, 2512, 91 L.Ed.2d 202 (1986). Accordingly, Grip-Pak's claims for damages based on its inability to market Grip-Pak I will be excluded from the jury due to the lack of a triable issue on lost profits.

With regard to the manufacture of Grip-Pak II, the question is more difficult: the evidence shows greater commercial interest from outsiders in this product, greater efforts in marketing it, and greater efforts on ITW's part to hinder the product's development. The evidence suggests that plaintiffs' manufacturing difficulties were linked to the financial difficulties imposed on them by ITW's lawsuit, and permits the inference that but for ITW's suit plaintiffs would have received further stockholder contributions, and an additional $50,000 in royalties from PI. Kovac's testimony, if credited by a jury over that of Koenig, would further permit the inference that, but for ITW's suit, Grip-Pak would have been able to sign a development contract with Anheuser-Busch.

That plaintiffs have established the fact of damage does not, however, answer the question whether they may recover as damages the additional profits they claim they would have earned but for ITW's lawsuit. The development contract with Busch required Grip-Pak to produce a commercially acceptable product, and to have production capacity for supplying carriers in sufficient numbers to conduct market tests. Neither of these steps ever came to pass. PI never had in place the necessary die-cutting equipment for full-scale manufacturing of the Siamese tubing used in Grip-Pak II, and Grip-Pak never developed an adaptor machine whereby Grip-Pak could be commercially applied to cans. Since Kovac, Glydon, and Koenig all testified in deposition that multi-packaging carriers cannot be marketed successfully without applicating equipment, Grip-Pak's failure to develop such equipment wholly undermines its claims of lost profits.

Significantly, this production failure has lasted long beyond the period when ITW's lawsuit was actively draining plaintiffs' resources and consuming their available time. As of this writing, the adaptor machine and the die cutting production remain unrealized possibilities. Grip-Pak II has still never been commercially tested, and the evidence strongly suggests that the chief reasons for its failure in the marketplace were technical. Both Packaging Industries and Mead Packaging at some point found that Grip-Pak II lacked "package integrity," which plaintiffs admit is an important factor in the success of any plastic carrier, and no product tests have ever demonstrated that conclusion to be wrong. The court further notes that the Grip-Pak II sample submitted by plaintiffs in connection with this motion has a tendency to break apart when subjected to any pressure. For purposes of this motion, however, the court has assumed that the product has greater structural integrity when stretched over the cans.

The failure to market Grip-Pak II since 1977 also cannot be explained by continuing financial problems, since plaintiffs have begun manufacturing a conventional plas-

tic carrier for profit. Plaintiffs ascribe their lack of efforts since 1977 to the Owen patents. While ITW apparently prosecuted these patents to block manufacture of Grip-Pak II, the assertion that the Owen patents truly preclude plaintiffs from manufacturing Grip-Pak II other than in Canada is supported solely by plaintiffs' own conclusory statements and is implicitly contradicted by the history of the Owen prosecution, in which the patent examiner found that the similarities between Owen's carrier and Grip-Pak II were unpatentable over the prior art. ITW has never enforced or even threatened to enforce the Owen patent against plaintifffs, and plaintiffs have never asked ITW whether it would do so if they began manufacturing efforts. When ITW first requested an interference, plaintiffs responded by narrowing their own claims, but plaintiffs have offered no testimony as to the significance of the claims they abandoned.

Plaintiffs claim that, but for ITW's lawsuit, they would have had the financial ability to overcome their manufacturing difficulties. Plaintiffs have put forth no evidence beyond self-serving opinion testimony, however, to support this fact. There is no testimony that a capital infusion in the amount of their own legal expenses would have been sufficient to commence manufacturing efforts, and plaintiffs' own estimates for 1974 and 1975 indicate needs for $500,000, a figure well above their legal costs and well beyond their assets. Plaintiffs have offered no evidence of available capital except unspecified amounts which one Grip-Pak stockholder testified he would have contributed but for the fear of escalating legal costs. Since Grip-Pak's equity contributions from stockholders equalled only $60,000 in cash over a three year period (1972–75), the court finds no factual basis from which a rational jury could infer that the needed equity would have been raised but for the lawsuit.

■ Plaintiffs have claimed that, even if their own ability to manufacture Grip-Pak is doubtful, they could claim damages from lost royalty payments as a licensor. This argument is doubly defective: not only does it fail to address the lack of proof

that Grip-Pak II could have been commercially viable, but fails to account for the fact that, except for the PI relationship, plaintiffs affirmatively chose back in the mid-seventies to manufacture Grip-Pak II themselves. Plaintiffs may not recover lost profits by projecting a course of business they deliberately didn't pursue. *See Indium Corp.*, 611 F.Supp. at 386. However, plaintiffs may claim as damages any royalties PI would have been willing to pay but for ITW's suit.

Plaintiffs have also offered an affidavit from William J. Lynk, an expert economist, to bolster their claim that profits are measurable. Dr. Lynk in his affidavit expresses the opinion that *if* there are no associated cost disadvantages to offset the advantage Grip-Pak II promised over ITW's carriers in eliminating material scrappage, Grip-Pak would have had the usual rational incentives to enter the market. Dr. Lynk has further opined that Grip-Pak's subsequent profits could be estimated by reference to ITW's profits and market share. Dr. Lynk simply assumes rational economic behavior according to a set of ideal facts, however, and nowhere addresses the issues of whether the associated cost disadvantages are in fact absent or whether Grip-Pak was technically and financially prepared to commence manufacturing efforts. The court fully recognizes that there is some basis for speculation in awarding damages, but Dr. Lynk's affidavit simply assumes too much. His affidavit therefore does not and cannot eliminate the problem of preparedness to enter the market. *Cf. Olympia Equipment Leasing Co. v. Western Union Telegraph Co.*, 797 F.2d 370, 382 (7th Cir.1986) (expert opinion which bears no relation to reality does not provide rational basis for estimating damages).

■ The court has reached this conclusion not without some hesitation, but is convinced that, presented with the same evidence at trial, it would be reversible error not to grant a directed verdict on the lost profits claims. There are no credibility issues involved in this calculation which indicate a preference for trial. Unlike the

plaintiff in *Neumann*, plaintiffs have not been able to substantiate their allegations that ITW scared off outside investors by its acts: while some Busch and Owens-Illinois documents indicate a wait-and-see attitude in response to ITW's suit, none of the executives from those firms have testified that they were otherwise ready and willing to go forward with Grip-Pak. Significantly, plaintiffs have had nine years since the resolution of ITW's suit in which to produce evidence of lost profits and also in which to begin marketing Grip-Pak II. They have done neither, and summary judgment is therefore appropriate. *See Celotex Corp.*, 106 S.Ct. at 2553.

■ This is not to say that plaintiffs can prove no damages beyond their legal expenses. Plaintiffs have shown a basis for inferring that, but for ITW's suit, PI would have delivered an additional $50,000 (perhaps more) in royalties and that but for ITW's prosecution of the Owen patent, their own patent on Grip-Pak II would have been broader. The latter injury might be measurable by some means other than a projection of profits. Plaintiffs have also shown that their legal debts influenced a stockholder contribution of uncertain amount and led them not to accept a $300,-000 equity contribution conditioned on personal guarantees. Finally, plaintiffs have shown that Coors considered the threat of patent liability in pricing its offer to buy Grip-Pak II in 1975–76. Testimony from Jeffrey Coors as to how the absence of ITW's actions would have changed his calculation might also provide a basis for estimating damages. The court expresses no opinion as to whether plaintiffs may still pursue such other means of proving damages at this stage of the litigation, or whether such means are ultimately feasible. The court does conclude, however, that plaintiffs cannot base damages on projections of manufacturing efforts which the evidence shows they were incapable of undertaking and where there is no basis for assuming commercial success of the products in question.

**Plaintiffs' State Law Claims**

ITW finally has moved to dismiss plaintiffs' state law claims on both substantive and jurisdictional grounds. This motion is denied. Since plaintiffs' antitrust claim remains in the case, the court continues to have pendent jurisdiction over the state law claims, and the substantive arguments for judgment on the state law claims—privilege and speculative profits—are coterminous with ITW's arguments about *Noerr-Pennington* and damages in the antitrust area. The court's rulings regarding the proper scope of plaintiffs' antitrust claims will therefore control the state-law claims as well.

**Conclusion**

Defendant's motion for sanctions is denied, and defendant's motion for summary judgment is denied in part and granted in part in accordance with this opinion. The case is set for a status hearing on September 30, 1986 at 9:30 a.m.

It is so ordered.